**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

| | |
|---|---|
| SPRINT SPECTRUM L.P., SPRINTCOM, INC. and SPRINT/UNITED MANAGEMENT COMPANY, | : <br> :   Case No. 19 Civ. 1215 <br> : <br> : |
|          Plaintiffs, | : <br> : |
|     -against- | : <br> : |
| AT&T INC., | : <br> : |
|        Defendant. | : |

----------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF**
**SPRINT'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND**
**<u>PRELIMINARY INJUNCTION</u>**

FRANKFURT KURNIT KLEIN & SELZ, P.C.
Craig B. Whitney
Kimberly M. Maynard
Lily Roos
488 Madison Avenue
New York, New York 10022
Tel.:  (212) 980-0120
Fax:  (212) 593-9175
cwhitney@fkks.com
kmaynard@fkks.com
lroos@fkks.com

*Attorneys for Plaintiffs Sprint Spectrum L.P.,*
*SprintCom, Inc. and Sprint/United Management*
*Company*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 2

    The Saturated Wireless Industry ........................................................................................... 2

    Wireless Technology: 3GPP and the Generation System .................................................... 3

    5G: The Next "Generation" Network .................................................................................... 4

    Sprint Has Undertaken Significant And Costly Efforts To Prepare A 5G Wireless
        Network .......................................................................................................................... 5

    AT&T Decides To Deceptively Re-Brand Its 4G LTE Advanced Technology
        As "5GE" ...................................................................................................................... 5

    AT&T's "5GE" Network Relies On Existing 4G LTE Advanced Technology ................. 7

    AT&T's 5GE Campaign Deceives Consumers ................................................................... 8

LEGAL STANDARD .................................................................................................................... 9

ARGUMENT ................................................................................................................................. 9

I.      SPRINT IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ..................... 9

    A.    Sprint Is Likely To Succeed On Its Lanham Act Claim ........................................ 9

        1.    The 5GE Claims Are Commercial Advertising Or Promotion ................. 10

        2.    AT&T's 5GE Claims Are Literally False ................................................. 12

        3.    The 5GE Claims Are, Alternatively, Impliedly False............................... 14

        4.    The 5GE Claims Are Material ................................................................... 16

        5.    Sprint Will Be Able To Prove The Remainder Of Its Claim.................... 17

    B.    Sprint Is Likely To Succeed On Its GBL §§ 349 And 350 Claims....................... 17

II.     SPRINT WILL SUFFER IRREPARABLE HARM IF AT&T IS NOT
      ENJOINED ..................................................................................................................... 18

A.      Irreparable Injury Is Presumed .............................................................. 18

B.      Sprint Has Shown Irreparable Injury ..................................................... 20

        1.      Sprint's Own 5G Network Rollout Will Be Harmed ................................ 20

        2.      There Is A Strong Connection Between The Deception And Lost
                Sales ..................................................................................... 22

        3.      AT&T's False Claims Damage Sprint's Reputation ................................ 23

III.    SPRINT HAS RAISED SERIOUS QUESTIONS GOING TO THE MERITS OF
        ITS CLAIMS AND THE BALANCE OF HARDSHIPS TIPS IN ITS FAVOR ............. 23

IV.     A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST ...................... 24

V.      SPRINT IS WILLING TO POST A BOND .................................................. 24

CONCLUSION ........................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Broker Genius, Inc. v. Zalta*,
   280 F. Supp. 3d 495 (S.D.N.Y. 2017)......................................................................9

*C=Holdings B.V. v. Asiarim Corp.*,
   992 F. Supp. 2d 223 (S.D.N.Y. 2013)..............................................................13, 16

*Casper Sleep, Inc. v. Mitcham*,
   204 F. Supp. 3d 632 (S.D.N.Y. 2016)...................................................................18

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*,
   843 F.3d 48 (2d Cir. 2016)...............................................................10, 13, 15, 16

*CJ Prod. LLC v. Snuggly Plushez LLC*,
   809 F. Supp. 2d 127 (E.D.N.Y. 2011) .............................................................10, 25

*Doctor's Assocs. v. Distajo*,
   107 F.3d 126 (2d Cir. 1997)...................................................................................24

*Dunkin' Donuts Inc. v. Albireh Donuts, Inc.*,
   96 F. Supp. 2d 146 (N.D.N.Y. 2000) ....................................................................24

*Euro-Pro Operating LLC v. Euroflex Americas*,
   *No.* 08 Civ. 6231 (HB), 2008 WL 5137060 (S.D.N.Y. Dec. 8, 2008)..............19, 23

*Famous Joe's Pizza, Inc. v. Vitale*,
   No. 10 Civ. 8861 (JSR), 2010 WL 5490893 (S.D.N.Y. Dec. 23, 2010) .................16

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
   314 F.3d 48 (2d Cir. 2002)......................................................................................10

*Gen. Cigar Co. v. G.D.M. Inc.*,
   988 F. Supp. 647 (S.D.N.Y. 1997) .........................................................................12

*Gen. Mills, Inc. v. Chobani, LLC*,
   158 F. Supp. 3d 106 (N.D.N.Y. 2016), *reconsideration denied*, No. 3:16 Civ.
   58, 2016 WL 1639903 (Apr. 25, 2016) ............................................................17, 24

*Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*,
   859 F. Supp. 1521 (S.D.N.Y. 1994)........................................................................11

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
   98 N.Y.2d 314 (2002) ..............................................................................................18

*Johnson & Johnson v. Carter-Wallace*,
 631 F.2d 186 (2d Cir. 1980) ............................................................................22

*Johnson & Johnson-Merck Consumer Pharm. Co. v. Procter & Gamble Co.*,
 285 F. Supp. 2d 389 (S.D.N.Y.), *aff'd*, 90 F. App'x 8 (2d Cir. 2003) ..............14, 21

*Karlin v. IVF Am., Inc.*,
 93 N.Y.2d 282 (1999) .....................................................................................18

*Maurizio v. Goldsmith*,
 230 F.3d 518 (2d Cir. 2000) (per curiam) .......................................................17

*McNeil-PPC, Inc. v. Pfizer Inc*,
 351 F. Supp. 2d 226 (S.D.N.Y. 2005) ...............................................16, 20, 23

*Merck Eprova AG v. Brookstone Pharm., LLC*,
 920 F. Supp. 2d 404 (S.D.N.Y. 2013) ...............................................10, 12, 15

*Merck Eprova AG v. Gnosis S.p.A.*,
 901 F. Supp. 2d 436 (S.D.N.Y. 2012), *aff'd*, 760 F.3d 247 (2d Cir. 2014) ......12, 13

*Mitchell Grp. USA LLC v. Udeh*,
 No. 14 Civ. 5745 (DLI) (JO), 2017 WL 9487193 (E.D.N.Y. Mar. 8, 2017) ..........10

*Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*,
 880 F. Supp. 1005 (S.D.N.Y. 1994) .................................................................11

*N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*,
 962 F. Supp. 2d 514 (S.D.N.Y. 2013) ..............................................................24

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
 883 F.3d 32 (2d Cir. 2018) ...............................................................................9

*Novo Nordisk A/S v. Becton Dickinson & Co.*,
 997 F. Supp. 470 (S.D.N.Y. 1998) ..................................................................14

*Polar Corp. v. Coca-Cola Co.*,
 871 F. Supp. 1520 (D. Mass. 1994) .................................................................25

*Reckitt Benckiser Inc. v. Motomco Ltd.*,
 760 F. Supp. 2d 446 (S.D.N.Y. 2011) ....................................................... *passim*

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
 241 F.3d 232 (2d Cir. 2001) ..................................................................12, 13, 23

*SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*,
 642 F. Supp. 2d 167 (S.D.N.Y.), *modified on reconsideration*, 642 F. Supp. 2d
 206 (S.D.N.Y. 2009) ...........................................................................14, 18, 19

iv

*Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.*,
  823 F. Supp. 1077 (S.D.N.Y. 1993)...................................................................25

*Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc.*,
  83 F. Supp. 2d 1016 (D. Minn. 2000)................................................................25

*Tambrands, Inc. v. Warner-Lambert Co.*,
  673 F. Supp. 1190 (S.D.N.Y. 1987)..................................................................13

*Telebrands Corp. v. Wilton Indus., Inc.*,
  983 F. Supp. 471 (S.D.N.Y. 1997) ...................................................................17

*Tiffany (NJ) Inc. v. eBay, Inc.*,
  600 F.3d 93 (2d Cir. 2010), *cert denied*, 131 S. Ct. 647 (2010) ............................16

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
  497 F.3d 144 (2d Cir. 2007)................................................................16, 18, 20, 24

*Verizon Directories Corp. v. Yellow Book USA, Inc.*,
  338 F. Supp. 2d 422 (E.D.N.Y. 2004) ...............................................................18

*Zeneca Inc. v. Eli Lilly & Co.*,
  No. 99 Civ. 1452 (JGK), 1999 WL 509471 (S.D.N.Y. July 19, 1999) ................................22

**Statutes**

15 U.S.C. § 1125.................................................................................... *passim*

New York General Business Law § 349.........................................................1, 17, 18

New York General Business Law § 350.................................................................18

**Other Authorities**

Fed. R. Civ. P. 65(c) ...................................................................................24

Federal Trade Commission, ".Com Disclosures," Mar. 2013 ......................................14

Plaintiffs Sprint Spectrum L.P., SprintCom, Inc., and Sprint/United Management Company (collectively, "Sprint") submit this memorandum of law in support of their motion (the "Motion") for a temporary restraining order and preliminary injunction against Defendant AT&T Inc. ("AT&T") to enjoin AT&T's false advertising and deceptive business practices committed in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and Sections 349 and 350 of the New York General Business Law (the "GBL").

## PRELIMINARY STATEMENT

AT&T has recently embarked on a massive, nationwide advertising campaign designed to deceive consumers into believing that it is operating a coveted and highly anticipated fifth generation wireless network, known as 5G.  In reality, AT&T, like all other major wireless providers, offers an enhanced fourth generation Long Term Evolution network, or 4G LTE Advanced.  AT&T's blatant deception is robbing Sprint of an opportunity to reap the full benefits of its own 5G plans, which it has spent years and billions of dollars developing.

Industry experts agree that 5G, which is expected to be faster and more reliable with fewer errors than any predecessor network, will transform wireless technology.  Sprint, AT&T, and their competitors are all working to deploy their 5G networks as soon as possible.  AT&T, however, is seeking to gain an unfair advantage in the costly and time-consuming race to 5G by touting the release of a "new" network, which it calls "5GE"—a transparent attempt to deceive consumers into believing that AT&T's 4G LTE Advanced network is 5G.

Calling its existing 4G LTE network "5GE" (or, on occasion, "5G E" or "5G Evolution") does not make it a 5G network—other than in the minds of consumers, who wrongly believe that AT&T is offering 5G technology or better.  AT&T's unlawful behavior thus threatens to sabotage the impact of the rollout of Sprint's *legitimate* 5G wireless technology that it is preparing to launch in nine major cities in the coming months.  AT&T's aggressive and

widespread false advertising campaign also harms Sprint and consumers by holding out AT&T's technology—which is precisely what customers purchase when choosing a wireless service provider—as more advanced than Sprint's.  AT&T's false claims entice consumers to switch wireless service providers (or remain AT&T subscribers) under false pretenses.

AT&T must, therefore, be enjoined from using the designation 5GE, 5G E, or 5G Evolution, or any designation containing 5G, in its advertisements for its wireless network and mobile devices unless and until AT&T's wireless network complies with 5G standards.

## STATEMENT OF FACTS

The relevant facts are set forth in the accompanying declarations of Bryan Fries ("Fries Decl."), Jay Bluhm ("Bluhm Decl."), Hal Poret ("Poret Decl."), and Craig Whitney ("Whitney Decl."), and the exhibits attached thereto.  They are summarized below.

### The Saturated Wireless Industry

Sprint has provided telecommunications services for over 120 years, developing a reputation among consumers for innovative technology and the most advanced equipment.  Fries Decl. ¶ 4.  Today, Sprint's legacy of innovation and service continues with an increased investment in improving quality across its network and a commitment to offer consumers a standards-based 5G wireless network, beginning in 2019.  *Id.* ¶ 5.

A strong reputation among consumers is critical to succeed in the highly saturated wireless industry.  About 95% of American consumers currently have mobile phones and the vast majority of those consumers already receive their mobile phone service from a Tier 1 service provider—Sprint, AT&T, Verizon, T-Mobile—or from other established and emerging competitors.  Fries Decl. ¶ 8.  As a result, service providers compete vigorously to retain current customers and attract new customers, predominantly from their competitors' existing customers.

2

*Id.* ¶ 9.  Even small technological advancements (or perceived advancements) can earn a provider significant competitive advantage.  *Id.* ¶ 10.

**Wireless Technology: 3GPP and the Generation System**

Because the quality and sophistication of a service provider's technology are significant drivers of market share, service providers compete aggressively to offer the latest wireless network technology.  Fries Decl. ¶ 10.  Significantly, wireless service providers follow standards formulated by an international body, known as the Third Generation Partnership Project, or 3GPP, for describing the technology on which their networks operate.  Bluhm Decl. ¶¶ 5, 7. Each major step forward in wireless cellular technology is known as a "generation," and each official publication of new industry standards issued by 3GPP is called a "Release."  *Id.* ¶ 6.  The generation and Release labels—such as 3G, 4G, and 4G LTE Advanced (discussed below)— ensure transparency and fairness in the wireless industry, because they denote verifiable technological characteristics that consumers and industry experts rely on to assess the sophistication and reliability of a wireless network's technology and compare it to a competitor's technology.  *Id.* ¶ 7.

3GPP has established specifications for third generation (or 3G) technology, fourth generation (or 4G) technology (known as 4G Long Term Evolution (4G LTE)), and later iterations of 4G technology such as 4G LTE Advanced.  Bluhm. Decl. ¶ 8.  4G LTE was first introduced in 3GPP Release 8.  *Id.* ¶ 9.  3GPP Releases 10, 13, and 14 all describe 4G LTE Advanced technologies and contain a series of enhancements for increasing the capacity and speed of wireless networks, including carrier aggregation, 4×4 multiple input, multiple output (MIMO) antennas, and 256 quadrature amplitude modulation (QAM).  *Id.*  Today, each of the

four Tier 1 wireless service providers operate a 4G LTE wireless network that offers these 4G LTE Advanced technologies in available markets.[1]  *Id.* ¶ 13.

### 5G: The Next "Generation" Network

The future of wireless service lies in the next generation of network technology: 5G. With super-fast speed and ultra-reliable wireless connectivity, 5G networks will allow faster streaming and downloading, especially of graphic-heavy audiovisual content, such as movies, videos, and games.  Fries Decl. ¶ 13.  They also will deliver enhanced capabilities for virtual reality technology, smart homes, and self-driving cars, among other advancements.  *Id.*

3GPP's Release 15 is the first Release to contain standards for 5G wireless technology. Bluhm Decl. ¶ 14.  As described in more detail in the Bluhm Declaration, it includes enhancements offering faster speeds, decreased latency, and increased network capacity.  *Id.*

The 5G network and the mobile devices used to access that network will require drastically updated hardware and software.  *Id.* ¶ 15.  For example, wireless service providers must offer consumers new 5G-enabled mobile phones and tablets that have faster processors and more antennas than those used in 4G LTE devices.  *Id.* ¶ 16.  Providers must equip cell towers with new 5G-enabled radios and additional antennas.  *Id.* ¶ 15.  And those providers that will use an extremely high frequency millimeter wave spectrum must install more cell sites to provide broad and contiguous 5G coverage, among other technological upgrades.  *Id.*  Overall, the transition from 4G to 5G will be the most noticeable upgrade in wireless technology in nearly a decade.  *Id.* ¶ 17; Fries Decl. ¶ 11.  No wireless service provider has yet to complete these tasks, and thus no consumers can yet enjoy the benefits of a wireless 5G network.  Bluhm Decl. ¶ 17; Fries Decl. ¶ 14.

---

[1] Where 4G LTE Advanced technology is unavailable, the wireless service providers operate on 4G LTE, 4G, or 3G technology.  Bluhm Decl. ¶ 13.

***Sprint Has Undertaken Significant And Costly Efforts To Prepare A 5G Wireless Network***

Although 5G networks are not here yet, they are on the horizon.  Each wireless service provider is trying to get there first.  The first wireless service providers to offer customers the ability to connect their mobile phones and tablets directly to a wireless 5G network can expect a significant growth in new customers and retention of existing customers.  Fries Decl. ¶ 11.

Sprint is poised to be an early—if not the first—provider of a true, standards-based 5G wireless network with 5G-enabled mobile devices and has announced launch plans for coverage in nine major metropolitan areas in early 2019.  Bluhm Decl. ¶ 23–24.  The company has undertaken significant and expensive 5G hardware upgrades to its 4G LTE network, including by installing Massive MIMO antenna deployments and 5G radios in its cell towers in those cities where it plans to launch 5G.  *Id.* ¶ 22; Fries Decl. ¶ 16.  Sprint also expects to offer its first 5G-enabled mobile phone in the first half of 2019, with a second phone expected soon thereafter.  Bluhm Decl. ¶ 23; Fries Decl. ¶ 16.  When these hardware upgrades are complete and its 5G phones are on the market, Sprint will only have to complete a simple software update to enable 5G in those areas.  Fries Decl. ¶ 16.

***AT&T Decides To Deceptively Re-Brand Its 4G LTE Advanced Technology As "5GE"***

AT&T has yet to deliver a contiguous mobile 5G network or release a 5G-enabled mobile phone or tablet capable of connecting directly to a 5G network.  Nor has AT&T made it possible for its wireless customers to experience the added benefits of a nationwide mobile 5G network.  Bluhm Decl. ¶ 19.

Nevertheless, in late December 2018, AT&T launched a new nationwide advertising campaign touting its new "5GE" or "5G Evolution" network.  As part of AT&T's extensive 5GE campaign, it released a series of television commercials claiming that "AT&T is America's best wireless network" and featuring the disparaging innuendo that other networks are "just ok."

5

Whitney Decl. Exs. A, B, C; *id.* ¶ 16.  The advertisements conclude with the voiceover

statement, "Now with 5GE" and the below graphic:



Whitney Decl. Ex. A.  AT&T also posted a series of advertisements on the internet, with the

same deceptive message, stating "AT&T IS THE NATION'S BEST NETWORK – NOW WITH

5GE:"



*Id.* Ex. B.  Other internet advertisements contain a voiceover announcing that "AT&T is the

nation's best network, now with 5GE," while the following screen is displayed:



*Id.* Ex. C.

6

AT&T updated its website as well to advertise 5GE- and 5G Evolution-capable mobile phones (which, in reality, lack the capacity to get the benefits of any wireless 5G network).  *Id.* Ex. D; Bluhm Decl. ¶ 17.  Further, AT&T recently announced a software update to its mobile devices—including very recently to the Apple iPhone that will affect millions of additional consumers—which will change the "LTE" service icon on the devices to say "5G E" with the "E" distinctly smaller and offset from the "5G," as follows:



Whitney Decl. Ex. F.  AT&T has also promoted these advertisements on its social media accounts.  *Id.* Ex. E.

### AT&T's "5GE" Network Relies On Existing 4G LTE Advanced Technology

The network that AT&T has falsely labelled "5GE" (or, occasionally, "5G E" or "5G Evolution") is actually its existing 4G LTE network with 3GPP 4G LTE Advanced enhancements.  Bluhm Decl. ¶ 18.  AT&T's own website confirms as much, stating that AT&T's "5GE" or "5G Evolution" network includes 4G LTE Advanced features like "carrier

aggregation," "4×4 MIMO," and "256 QAM."  Whitney Decl. Ex. F.  Indeed, AT&T's network

coverage map depicts wireless service on only 3G, 4G, and 4G LTE networks.  *Id.* Ex. G.  And

AT&T's Chief Technology Officer has conceded that AT&T was merely "upgrading cell towers

with LTE Advanced features."  *Id.* Ex. H.

***AT&T's 5GE Campaign Deceives Consumers***

The media and industry experts quickly seized on AT&T's deception.  Whitney Decl. Ex.

I ("AT&T misleads customers by updating phones with fake 5G icon"); Ex. J ("AT&T's 5G

Stunt Is Decried As Misleading & A Marketing Ploy"); Ex. K ("AT&T decides 4G is now '5G,'

starts issuing icon-changing software updates").  Consumers and AT&T's competitors, however,

are the ones who will suffer the harm.

After conducting a double-blind advertising perception survey in which wireless

consumers watched one of AT&T's commercials,[2] survey research expert Hal Poret concluded

that AT&T's "5GE" advertising campaign misleads a remarkably high percentage of consumers

into believing that AT&T offers a 5G wireless network or better.  Poret Decl. ¶ 5.  When asked

open-ended questions about the commercial's main message, or what AT&T was conveying

about why a consumer should choose AT&T over its competitors, a net[3] 35% of consumers

wrongly believed that AT&T is offering a 5G network.  *Id.* ¶ 11.  This alone demonstrates that a

substantial percentage of wireless service consumers either do not notice the letter "E" in

AT&T's "5GE," or perceive "5GE" to be the same as, equivalent to, or better than 5G.  *Id.* ¶ 13.

---

[2] AT&T's 5GE advertising campaign features several different commercials that all contain the same "5GE" claim and vary only in dramatic set up.  *See* Whitney Decl. Exs. A, B & C; *id.* ¶ 16.

[3] As described in the Poret Declaration, a "net" deception rate reflects the amount by which the percentage in the Test Group exceeds the percentage in the Control Group.  The actual percentage of respondents who were deceived was higher, often significantly so.  Poret Decl. p. 3, n.1.

Furthermore, when asked questions about which generation of wireless technology AT&T was offering, an <u>astounding net 54% of consumers</u> were deceived, wrongly believing that AT&T's network uses 5G technology, the equivalent, or better.  *Id.* ¶ 16.  And a net 43% of consumers (<u>59%</u> before deducing the Control Group) indicated that, based on AT&T's "5GE" claim, they understood that an AT&T mobile phone would be capable of running on a 5G network if purchased today.  *Id.* ¶ 17.  Significantly, there was little difference in the understanding between the consumers who saw AT&T's "5GE" commercials and those who viewed a variation of AT&T's commercial that replaced "5GE" with "5G."  *Id.* ¶ 14.  In other words, AT&T's advertising for a "5GE" network is comparable to advertising a "5G" network. *Id*.

In sum, AT&T's 5GE advertisements are deceptive and must be immediately enjoined.

## LEGAL STANDARD

A district court may grant a preliminary injunction if the moving party establishes "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest."  *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).  A plaintiff "need not show that success is an absolute certainty" and "need only make a showing that the probability of [it] prevailing is better than fifty percent."  *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 510 (S.D.N.Y. 2017).

## ARGUMENT

I.    **SPRINT IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS**

A.    **Sprint Is Likely To Succeed On Its Lanham Act Claim**

Sprint will be able to prove all the required elements of its claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  As explained below, it will demonstrate that all of

AT&T's claims to operate on "5GE" (the "5GE Claims") are "commercial advertising or promotion." Moreover, it will show that the 5GE Claims are: (1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to Sprint. *See Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*, 843 F.3d 48, 65 (2d Cir. 2016).

### 1.   The 5GE Claims Are Commercial Advertising Or Promotion

AT&T's consumer-facing 5GE Claims constitute "commercial advertising or promotion" under the Lanham Act. 15 U.S.C. § 1125(a)(1)(B). AT&T's conventional advertisements—such as television and internet commercials and promotions—unquestionably meet this requirement. But the Lanham Act "encompasses more than the traditional advertising campaign[.]" *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002). The "touchstone" of whether a particular statement supports a Lanham Act claim is whether "the contested representations are part of an organized campaign to penetrate the relevant market." *Id.* Accordingly, labels and product names routinely give rise to false advertising claims, particularly where they speak to or reference a broader promotional campaign. *See*, *e.g.*, *CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 147 (E.D.N.Y. 2011) ("As Seen On TV" claim on "tags affixed to" defendants' products was advertising subject to Lanham Act); *Merck Eprova AG v. Brookstone Pharm., LLC*, 920 F. Supp. 2d 404, 424 (S.D.N.Y. 2013) (labels on defendants' products "clearly constitute advertising under the Lanham Act" in part because they were part of "an organized [advertising] campaign"); *Mitchell Grp. USA LLC v. Udeh*, No. 14 Civ. 5745 (DLI) (JO), 2017 WL 9487193, at *4 (E.D.N.Y. Mar. 8, 2017), report and recommendation adopted, No. 14 Civ. 5745 (AMD), 2017 WL 3208532 (E.D.N.Y. July 28, 2017) (false labels on defendants' products gave rise to Lanham Act false advertising claim).

AT&T's placement of the "5GE" icon on its mobile phones and tablets is commercial advertising under the Lanham Act.  It is part of a robust and carefully choreographed marketing campaign—including television and internet advertisements and website and social media promotions—to convince consumers that AT&T's 4G LTE Advanced network is a 5G network. Unless enjoined, the icon will appear on the mobile devices of millions of consumers who are, at all times, determining whether to renew their AT&T service subscriptions or switch to another, potentially more advanced, wireless service.  Fries Decl. ¶¶ 9, 21.

AT&T's use of the 5GE phone icon is therefore (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.  *See Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535–36 (S.D.N.Y. 1994).  The 5GE screen icon is designed as part of AT&T's 5GE campaign to convince consumers to become or remain AT&T customers by deceiving them into believing that AT&T's network is more advanced than the networks of its competitors (which truthfully label their network icons, "LTE").  The 5GE screen icon is "aimed directly" at potential Sprint consumers and is intended to promote AT&T's service over Sprint's.  This is commercial advertising.  *See Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc*., 880 F. Supp. 1005, 1020 (S.D.N.Y. 1994) ("It is clear that the primary concern of Congress in requiring 'commercial advertising or promotion' was to ensure that the Lanham Act did not reach speech that did not promote a competitor's product.").

The use of the 5GE phone icon does not, as AT&T will surely argue, merely inform consumers that their mobile devices are operating on a new type of enhanced network.  If that were true, then the mobile devices would continue to display "LTE," as most do now, and as do

the mobile devices connected to the networks of AT&T's competitors.  AT&T has changed

nothing about consumers' phones or tablets to enable them to operate on and receive the benefits

of a 5G network.  Bluhm Decl. ¶ 17.  It merely began marketing its existing 4G LTE Advanced

network as 5G (with a tiny "E"), and has taken the extreme step of applying that marketing

directly to consumers' mobile devices.  Whitney Decl. Ex. F.

The 5GE screen icon is a marketing ploy, meant to reinforce the deceptive message that

AT&T is simultaneously delivering to consumers via television, internet, and other media.

AT&T even promotes images of the phone with the 5GE screen icon in digital media and has

updated its website to allow consumers to sort devices for purchase by 5GE compatibility.  *See*

Whitney Decl. Exs. D & F.  The screen icon is thus part of AT&T's "organized campaign" to

promote its 5GE deception nationwide.  *See Merck Eprova AG*, 920 F. Supp. 2d at 424; *Merck*

*Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 451 (S.D.N.Y. 2012), *aff'd*, 760 F.3d 247 (2d

Cir. 2014) (defendants' claims were advertisements even though "they accompanied shipments

to existing customers" in part because they were also "distributed . . . widely within the industry"

as part of an "organized campaign").  Accordingly, AT&T's promotion of its 5GE network by

changing the mobile device screen icon from "LTE" to "5GE"—in addition to its other, more

traditional advertisements asserting 5GE Claims—falls within the ambit of Section 43(a)(1)(B).

### 2.      AT&T's 5GE Claims Are Literally False

AT&T's 5GE Claims are "literally false as a factual matter."  *S.C. Johnson & Son, Inc. v.*

*Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001).  "A court may determine, based on its own

common sense and logic in interpreting the message, whether or not an advertisement or

representation made in a commercial context is literally true or false."  *Gen. Cigar Co. v. G.D.M.*

*Inc.*, 988 F. Supp. 647, 665–66 (S.D.N.Y. 1997).  Because the 5GE Claims are literally false,

Sprint need not reference their "impact on the buying public" to show a likelihood of success on this element of its claim.  *S.C. Johnson & Son, Inc.*, 241 F.3d at 238.

A claim is literally false when it has an unambiguous meaning that conflicts with "the reality it purports to describe."  *Reckitt Benckiser Inc. v. Motomco Ltd.*, 760 F. Supp. 2d 446, 454 (S.D.N.Y. 2011) (quotation omitted).  For example, labels that misrepresent an objective characteristic of their product are literally false.  *See*, *e.g.*, *Merck Eprova AG*, 901 F. Supp. 2d at 451 (S.D.N.Y. 2012) (drug manufacturer's product specification sheets were literally false because they described the product by the wrong name).  And, in determining falsity, courts may use industry standards or conventions as the objective truth or "reality" against which the challenged claim is measured.  *See*, *e.g.*, *id.* at 444–45 (relying on naming conventions to assess the veracity of defendant's product labeling); *Church & Dwight Co.*, 843 F.3d at 54 (relying on "medical conventions used by doctors to measure and describe the duration of pregnancy" to determine falsity of defendant's statements about its pregnancy test).

AT&T's 5GE Claims are literally false because, as set forth above and in the accompanying Bluhm Declaration, AT&T's "5GE" (or, occasionally, "5G Evolution") network is actually a 4G LTE network with 4G LTE Advanced features.  Bluhm Decl. ¶ 18.  AT&T's claims thus contradict both the objective standards of the 3GPP and the reality of the consumer experience.  The unambiguous message of the 5GE Claims—that AT&T's network is a 5G network—is objectively false.  *See C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 243 (S.D.N.Y. 2013) (statements literally false where "the *unambiguous* message sent by" them was not true) (emphasis in original).[4]

---

[4] The Court could also determine that the 5GE Claims "necessarily and unambiguously imply" the false message that AT&T operates on 5G, and are thus likewise facially false.  *Church & Dwight Co.*, 843 F.3d at 65; *Tambrands, Inc. v. Warner-Lambert Co.*, 673 F. Supp. 1190, 1194 (S.D.N.Y. 1987).  Claims that are false by necessary implication are treated as literally false and

### 3.    The 5GE Claims Are, Alternatively, Impliedly False

Although the 5GE Claims are literally false (or false by necessary implication), to the extent that AT&T would argue that the "E" or "Evolution" somehow cures the deception of using 5G, Sprint would still prevail on the merits.  *First*, it is a fundamental truth-in-advertising principle that a disclosure cannot contradict the claim it purports to clarify.[5]  *Second*, the use of the term "5GE," "5G E" or "5G Evolution"[6] is, at a minimum, impliedly false, meaning it is "likely to deceive or confuse consumers."  *SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 167, 202 (S.D.N.Y.), *modified on reconsideration*, 642 F. Supp. 2d 206 (S.D.N.Y. 2009).

Sprint can conclusively demonstrate that the 5GE Claims are impliedly false.  *See*, *e.g.*, *Novo Nordisk A/S v. Becton Dickinson & Co.*, 997 F. Supp. 470, 475 (S.D.N.Y. 1998) (implied falsity supported by consumer survey evidence).  Sprint's double-blind advertising perception survey, performed by a leading advertising expert, establishes that the 5GE Claims mislead a high percentage of consumers into believing that AT&T is offering a 5G wireless network or

---

thus require no further evidence of deception.  *See*, *e.g.*, *Johnson & Johnson-Merck Consumer Pharm. Co. v. Procter & Gamble Co*., 285 F. Supp. 2d 389, 391–92 (S.D.N.Y.), *aff'd*, 90 F. App'x 8 (2d Cir. 2003) (defendant's advertising claims were literally false and "convey[ed] a false message by necessary implication").

[5] *See*, *e.g.*, Federal Trade Commission, ".Com Disclosures," Mar. 2013, at 5, *available at* https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf ("If a disclosure provides information that contradicts a material claim, the disclosure will not be sufficient to prevent the ad from being deceptive."), available as of Feb. 6, 2019.

[6] Although the "E" in 5GE apparently stands for "Evolution," AT&T almost exclusively uses the short form "5GE" or "5G E" in its advertising.  *See*, *e.g.*, Whitney Decl. Exs. A, B & C.  Where "Evolution" appears at all, it is written in miniscule font, often buried in a small disclaimer that flashes momentarily.  *Id*.  Regardless, adding the word "Evolution" to 5G is no less deceptive than the letter "E" because, as discussed herein, the "5G" label still unambiguously communicates an objectively false message that AT&T operates on a 5G network.

14

better and that consumers do not recognize any difference between the use of "5GE" versus, simply, "5G" in AT&T's advertising.  A remarkable net 54% of consumers surveyed answered that they believed that AT&T is offering a 5G network or better.  Poret Decl. ¶ 16.  And a net 43% of consumers understood that an AT&T mobile phone would be capable of running on a 5G network if purchased today.  *Id.* ¶ 17.  Of course, this perception is contrary to the objective fact that AT&T's "5GE" network is a 4G LTE network and not a 5G network, and that consumers cannot enjoy the benefits of any 5G network with their current 4G-enabled devices.  Bluhm Decl. ¶¶ 9, 17.

Sprint's consumer survey also confirms that AT&T's commercials communicate the false comparative message that AT&T—unlike its competitors—is offering a 5G network.  In open-ended format alone, a net 35% percent of consumers who watched AT&T's commercial answered that the commercial's main message, and the reason provided by the commercial for choosing AT&T over its competitors, is that AT&T has a 5G network.  Poret Decl. ¶ 11.  For example, consumers described the main message of AT&T commercial as "ATT is the nation's best network and has 5 G"; "AT&T now has 5G"; and "at&t now has reliable 5g network available and it was implied that the other companies are not as reliable."  *Id.* ¶ 12.

The results of the survey confirm the existence of significant consumer confusion.  Many courts, in fact, have held that a far smaller percentage of misled consumers constitutes sufficient evidence of consumer deception.  *See Church & Dwight Co.*, 843 F.3d at 68 (affirming district court's reliance on consumer deception survey in which 16.0% or 17.3% of survey participants took away the false message); *Merck Eprova AG*, 920 F. Supp. 2d at 420 (net 21% of pharmacists and net 11% of physicians surveyed were misled, which was "substantial").[7]

---

[7] Even without its conclusive consumer deception survey, Sprint would prevail on implied falsity because AT&T "intentionally set out to deceive the public," including via deliberate and

### 4.      The 5GE Claims Are Material

The 5GE Claims are "designed to, and are likely to, have a material effect on consumers' purchasing decisions."  *Famous Joe's Pizza, Inc. v. Vitale*, No. 10 Civ. 8861 (JSR), 2010 WL 5490893, at *3 (S.D.N.Y. Dec. 23, 2010); *McNeil-PPC, Inc. v. Pfizer Inc*, 351 F. Supp. 2d 226, 248 (S.D.N.Y. 2005) (citing 4 McCarthy on Trademarks & Unfair Competition § 27:35) ("there must be 'some showing that the defendant's misrepresentation was 'material' in the sense that it would have some effect on consumers' purchasing decisions'").  Courts in the Second Circuit also determine materiality by asking whether the claims misrepresent an inherent quality or characteristic of the product at issue.  *See Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 112 (2d Cir. 2010), *cert denied*, 131 S. Ct. 647 (2010); *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 n.3 (2d Cir. 2007) (plaintiff showed materiality where "it [wa]s undisputed that picture quality is an inherent and material characteristic of multichannel video service").

The 5GE Claims speak to an inherent and foundational characteristic of wireless service because they describe the technology on which the network itself operates—the very thing that customers are being asked to purchase.  *See* Fries Decl. ¶ 10.  As set forth above and in the accompanying Fries Declaration, offering 5G service to consumers is a significant objective of

---

egregious conduct, and so consumer deception should be presumed.  *C=Holdings B.V.*, 992 F. Supp. 2d at 242 (quotation omitted); *see also Church & Dwight Co.*, 843 F.3d at 65 ("[C]ourts have allowed implied falsity to be supported by evidence that the defendant intended to deceive the public through 'deliberate conduct' of an 'egregious nature[.]'") (quoting *Merck Eprova*, 760 F.3d at 255–56).  AT&T has acknowledged (in just a few pages on its website that most consumers never see) that the 5GE network runs "on our existing LTE network."  Whitney Decl. Ex. F.  *See also id.* Ex. G.  Yet it is flooding the market with 5GE advertisements.  And it appears to revel in the fact that it has deceived the marketplace and frustrated competitors by making this false statement the centerpiece of its new promotional campaign.  When asked about the potentially misleading nature of the 5GE Claims, the CEO of AT&T's wireless division quipped: "I have now occupied beachfront properties in my competitor's head, [and] that makes me smile. . . . Every company is guilty of building a narrative of how you want the world to work."  *Id.* Ex. J.  The egregious and deliberate nature of this false advertising warrants a presumption of consumer deception.

Sprint and the other major wireless service providers.  Fries Decl. ¶ 15.  Consumers, media, and industry groups have focused substantial attention on the upcoming 5G launch.  *See* Whitney Decl. Ex. L.  This collective focus on the movement to 5G underscores that the availability of 5G—like 4G before it—will be a major driver of consumer purchasing decisions.  AT&T's 5G Claims, which speak to the identity of AT&T's service, are material.  *See Telebrands Corp. v. Wilton Indus., Inc.*, 983 F. Supp. 471, 475 (S.D.N.Y. 1997) ("AS SEEN ON T.V." logo was material because it pertained to the product's "identity" and "differentiate[d] it from other products of a similar type").

     **5.**      **Sprint Will Be Able To Prove The Remainder Of Its Claim**

Sprint can likewise satisfy the remaining elements of a Lanham Act false advertising claim.  As addressed below, Sprint has and will continue to be injured unless and until an injunction issues.  Moreover, AT&T's misstatements are featured on television and the internet and are being distributed to the mobile devices of millions of consumers nationwide, and thus have been placed in interstate commerce.  *See, e.g., Gen. Mills, Inc. v. Chobani, LLC*, 158 F. Supp. 3d 106, 113, 117 (N.D.N.Y. 2016), *reconsideration denied*, No. 3:16 Civ. 58, 2016 WL 1639903 (Apr. 25, 2016) (element requiring challenged statements to be placed in interstate commerce was met where the statements were made in "digital content").  Sprint has therefore shown a likelihood of success on its Lanham Act claim.

     **B.**      **Sprint Is Likely To Succeed On Its GBL §§ 349 And 350 Claims**

Sprint is equally likely to prevail on its claims under New York law.  Sprint will be able to show all of the required elements of its claim under New York General Business Law § 349, namely, that (1) AT&T's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) Sprint has been injured as a result.  *See Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (per curiam).  In addition, "[t]he standard for recovery under

17

General Business Law § 350, while specific to false advertising, is otherwise identical to section 349." *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 n.1 (2002).

As described above, AT&T's false statements are directed at consumers because they are included in advertisements that are "part of a broad campaign" to deceive consumers in New York and elsewhere.[8] *See Verizon Directories Corp. v. Yellow Book USA, Inc.*, 338 F. Supp. 2d 422, 428 (E.D.N.Y. 2004). The deceptive acts are also materially misleading and have caused injury to Sprint. Sprint has therefore shown a likelihood of success on the merits of its Section 349 and 350 claims.

## II.   SPRINT WILL SUFFER IRREPARABLE HARM IF AT&T IS NOT ENJOINED

### A.   Irreparable Injury Is Presumed

Irreparable harm should be presumed here, where there is a likelihood of success on the merits, the parties are in direct competition, and the challenged advertisements make comparative claims. *See*, *e.g.*, *Time Warner Cable, Inc.*, 497 F.3d at 162. Notably, the 5GE Claims need not disparage Sprint *by name* for the presumption to apply. It is sufficient that Sprint and AT&T compete in the same market and that consumers would understand that AT&T's advertisements disparage Sprint. *Id.* (irreparable injury presumed where DirecTV's ads disparaged "cable," but did not mention plaintiff Time Warner Cable by name); *SimplexGrinnell LP*, 642 F. Supp. 2d at 204 (presumption awarded even though advertisement did not mention

---

[8] In addition, the use of the "5GE" mobile device screen icon unquestionably constitutes a consumer-oriented deceptive act under Section 349. GBL § 349 "appl[ies] to virtually all economic activity" and has been applied to "numerous, ever-changing types of false and deceptive business practices which plague consumers in [New York]." *Karlin v. IVF Am., Inc.*, 93 N.Y.2d 282, 291 (1999); *see also Casper Sleep, Inc. v. Mitcham*, 204 F. Supp. 3d 632, 642 (S.D.N.Y. 2016) (noting that "§ 349 encompasses those acts or practices which undermine a consumer's ability to evaluate his or her market options and to make a free and intelligent choice") (quoting *N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 102 A.D.3d 5 (2d Dep't 2012)).

the plaintiff by name); *Euro-Pro Operating LLC v. Euroflex Americas, No.* 08 Civ. 6231 (HB), 2008 WL 5137060, at *5 (S.D.N.Y. Dec. 8, 2008) (same).

Sprint and AT&T are head-to-head competitors in a market where currently 95% of American consumers have mobile phones and 98% receive their wireless service from a Tier 1 service provider.  Fries Decl. ¶ 8; Whitney Decl. Ex. N.  Sprint and AT&T are, therefore, "obvious competitors with respect to [the] misrepresented product."  *Reckitt Benckiser Inc.,* 760 F. Supp. 2d at 453.

Moreover, the 5GE Claims are inherently comparative.  They address the state of AT&T's alleged technology in relation to that of the remaining wireless industry.  AT&T claims to be the best *because* it now offers 5G (which no other network claims to have): "AT&T is the Nation's Best Network, now with 5GE."[9]  That notion is further reinforced by the slogan that "Networks . . . should never be just ok," a not-so-subtle suggestion that Sprint and other competitors are "just ok."  Whitney Decl. Exs. B & C.  A reasonable consumer would, accordingly, understand that the 5GE Claims disparage Sprint.  *See Euro-Pro Operating LLC, No.* 08 Civ. 6231 (HB), 2008 WL 5137060, at *5 (S.D.N.Y. Dec. 8, 2008) (infomercials touting "superiority of" defendant's product over "ordinary" or "regular" other products contained comparative claims which "w[ould] likely cause injury"); *SimplexGrinnell LP*, 642 F. Supp. 2d at 184, 204 (advertisements that defendant "could offer a better value and could provide substantial cost savings" were comparative and gave rise to a presumption of irreparable harm). Accordingly, in false advertising cases such as these, irreparable injury is presumed.

---

[9] As noted above, AT&T has produced many variations of this advertisement.  While there are some differences, they all convey the sentiment that AT&T is better than the other wireless providers, including Sprint.  *See* Whitney Decl. Exs. A, B, & C; *id.* ¶ 16.

### B.       Sprint Has Shown Irreparable Injury

Even without the benefit of a presumption, Sprint has more than a "reasonable basis" to claim it will be irreparably harmed absent an injunction.  *See Time Warner Cable*, 497 F.3d at 161.  Sprint need only show that it will "*probably* be harmed if defendant's advertising tend[s] to mislead consumers in the manner alleged." *McNeil-PPC,* 351 F. Supp. 2d at 247 (emphasis added).  Here, the risk of irreparable harm is especially acute because (1) Sprint has already spent countless hours and billions of dollars in preparation for the launch of its legitimate 5G network, the impact of which will be permanently undermined if AT&T's deception continues; (2) the wireless industry is atypically saturated, and thus any sale earned by one company is necessarily a sale lost by its competitor; and (3) AT&T's false statements unfairly disparage Sprint, damaging Sprint's reputation in the marketplace with unquantifiable results.

### 1.       Sprint's Own 5G Network Rollout Will Be Harmed

AT&T's deception will irreparably damage Sprint's plans to launch and market its own, true, standards-based wireless 5G network.  Fries Decl. ¶ 19.  Sprint has spent billions of dollars and several years building a 5G network in targeted markets.  *Id.* ¶ 17.  This effort has included, among other upgrades, installing the necessary network hardware, like 5G radios and Massive MIMO antennas.  Bluhm Decl. ¶ 22; Fries Decl. ¶ 16.  And, because currently available mobile devices lack the processors and antennas necessary to experience the benefits of a wireless 5G network, Sprint, in conjunction with mobile device manufacturers, has also invested in developing 5G-enabled consumer devices.  Bluhm Decl. ¶ 23; Fries Decl. ¶ 16.  It expects to offer its first 5G mobile phone in the first half of 2019, with a second device expected soon thereafter.  Bluhm Decl. ¶ 23; Fries Decl. ¶ 16.  Once these upgrades are fully installed and functioning, and 5G phones are on the market, Sprint will be prepared to begin rolling out its 5G network, beginning in nine cities.  Bluhm Decl. ¶ 23.

The benefits of this years-long and multi-billion-dollar effort would be significantly undermined were AT&T allowed to continue advertising its false 5G technology as the real thing.  AT&T's false "5GE" indication will deceive consumers into believing that they are connected to a 5G wireless network, when they are connected to a 4G LTE Advanced network, and that AT&T has a broad, contiguous 5G wireless network, when it does not.  Bluhm Decl. ¶ 20.  Especially during the early years of 5G, AT&T's 5GE gimmick will rob Sprint of the opportunity to reap the full financial benefits its efforts to build standards-based 5G coverage. Fries Decl. ¶ 19.  As Sprint is rolling out and promoting its 5G network, consumers will be deceived into believing that AT&T's "5GE" network is already a 5G network.  Bluhm Decl. ¶ 20.  In short, AT&T's deceptive acts will deprive Sprint of the opportunity to compete fairly for customers when actual 5G technology is viable.

AT&T's 5GE Claims also threaten to irrevocably confuse consumers about new 5G technology and undo the objective measurements and specifications that have, thus far, regulated competition in the marketplace.  Fries Decl. ¶ 20; Bluhm Decl. ¶ 21.  Because consumers have not yet experienced 5G technology, they are "particularly attentive and educable" when it comes to advertising for that product, so the risk of irreparable harm is especially acute.  *Johnson & Johnson-Merck Consumer Pharm. Co.*, 285 F. Supp. 2d at 393 (where "false advertising is occurring at the inception of a new product launch . . . [c]orrecting the false impressions made on consumers will [] be difficult"); *see also Reckitt Benckiser Inc.*, 760 F. Supp. 2d at 454 (noting uncertainty of measuring loss in a "new market").  Consumers' experience with AT&T's "5GE" technology—which is identical to, and thus provides no real benefit over, existing 4G LTE Advanced technology—will temper enthusiasm for real 5G, thereby further diminishing the value of Sprint's 5G rollout.  And by falsely characterizing 4G LTE Advanced technology as 5G, the 5GE Claims erode the authority of the specifications set by 3GPP—the standard-setting body

in the wireless industry, tasked with ensuring uniform, objective references to wireless technology.  Bluhm Decl. ¶ 21.  AT&T's organized effort to muddy accepted 5G standards cannot be undone, and its effects on the 5G rollout will reverberate throughout the industry in unpredictable ways.

### 2.   There Is A Strong Connection Between The Deception And Lost Sales

There is a strong "logical causal connection" between AT&T's deception and Sprint's likely lost sales because the two companies are head-to-head competitors in a market where nearly every available consumer has already selected a wireless service provider.  *Reckitt Benckiser*, 760 F. Supp. 2d at 454.  Consequently, "the sales of [AT&T's] products certainly impact the sales of" Sprint's.  *Id.*; *Johnson & Johnson v. Carter-Wallace*, 631 F.2d 186, 190 (2d Cir. 1980) (plaintiff "show[ed] a logical causal connection between the alleged false advertising and its own sales position" in part because "[f]or each new [] user" of defendant's product, "a corresponding decline in the use of [plaintiff's product . . .] appears probable"); *Zeneca Inc. v. Eli Lilly & Co.*, No. 99 Civ. 1452 (JGK), 1999 WL 509471 at *38  (S.D.N.Y. July 19, 1999) (because plaintiff and defendant were head-to-head competitors, "any sale of" defendant's product was "a lost sale of" plaintiff's product).

These cases finding risk of irreparable injury contained far less risk than Sprint has shown here.  In the U.S. wireless market, nearly every consumer already has a mobile phone. Fries Decl. ¶ 8.  The only way for AT&T, for instance, to add new customers is by diverting customers from its competitors, notably, Sprint.  *Id.* ¶ 9.  As a result, each time AT&T deceives a consumer with its false 5GE Claims, it likely either diverts an existing customer from a Tier 1 wireless provider or retains an AT&T customer who may have switched to one of those providers.  *Id.* ¶¶ 8–9.  There is no reasonable method, however, for Sprint to determine precisely how many consumers it will have lost (either by customers switching to or remaining with

AT&T) as a result of AT&T's 5G Claims.  Thus, the quantity of diverted sales from Sprint as a result of AT&T's deception is "sufficiently speculative" to call into question Sprint's ability to recover full money damages at trial, thereby supporting preliminary injunctive relief.  *See S.C. Johnson & Son, Inc.*, 930 F. Supp. at 786.

### 3.     AT&T's False Claims Damage Sprint's Reputation

Finally, AT&T's false and misleading statements irrevocably erode Sprint's goodwill. The 5GE Claims falsely disparage Sprint's network as inadequate and outdated, compared to 5G. This undermines Sprint's hard-earned reputation among consumers.  *See* Fries Decl. ¶¶ 4–6.  The loss of goodwill provides an additional basis for Sprint's irreparable injury.  *Reckitt Benckiser*, 760 F. Supp. 2d at 454 ("[P]rospective loss of this good will alone is sufficient to support a finding of irreparable harm.") (internal citations omitted).

## III.     SPRINT HAS RAISED SERIOUS QUESTIONS GOING TO THE MERITS OF ITS CLAIMS AND THE BALANCE OF HARDSHIPS TIPS IN ITS FAVOR

Without the relief requested here, Sprint will suffer significant irreparable harm and consumers will continue to be deceived about the objective qualities of 5G technology. Conversely, AT&T can comply with the relief sought with comparatively minimal effort.  Any references to 5GE, 5G E or 5G Evolution on AT&T's website and other internet advertisements can be changed with little expense and effort.  *See* Fries Decl. ¶ 22.  The 5GE mobile device icon also can be changed with a simple software update, just as it appeared in the first place.  *See* Bluhm Decl. ¶ 20.  And although television and internet advertisements may be more costly to replace or alter, they are frequently the subject of injunctive relief.  *See*, *e.g.*, *S.C. Johnson & Son, Inc.*, 241 F.3d at 241; *McNeil-PPC, Inc.*, 351 F. Supp. at 231-32; *Euro-Pro Operating LLC*, No. 08 Civ. 6231 (HB), 2008 WL 5137060, at *2 (S.D.N.Y. Dec. 8, 2008).  Overall, the balance of hardships favors Sprint, and combined with the fact that Sprint has established, at a

minimum, "sufficiently serious questions going to the merits" of its claims, an injunction should issue. *Time Warner Cable, Inc.*, 497 F.3d at 153.

## IV. A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST

The public will benefit from the injunctive relief requested here. As a general matter, "[i]t is self-evident that preventing false or misleading advertising is in the public interest." *Gen. Gen. Mills, Inc.*, 158 F. Supp. 3d at 121. And where, as here, the false claims involve new technology on a product that is owned by *nearly every consumer*, there is an especially strong risk of harm to the marketplace, which continues to suffer from AT&T's disregard for the objective, fact-based standards underlying the industry. Public interest would thus be "well served" by the relief requested here, namely, an order restraining AT&T from using any designation containing 5G to advertise its non-5G wireless service to avoid consumers purchasing AT&T's wireless service "based on false advertising." *N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 524 (S.D.N.Y. 2013).

## V. SPRINT IS WILLING TO POST A BOND

The Court is afforded broad discretion in setting the sum for the security upon issuance of a temporary restraining order or preliminary injunction. Fed. R. Civ. P. 65(c); *General Mills Inc.*, 158 F. Supp. 3d at 122. This broad discretion includes dispensing with the bond requirement entirely. *See*, *e.g*., *Doctor's Assocs. v. Distajo,* 107 F.3d 126, 136 (2d Cir. 1997) ("Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement 'where there has been no proof of likelihood of harm . . . .'"); *Dunkin' Donuts Inc. v. Albireh Donuts, Inc.,* 96 F. Supp. 2d 146, 151 (N.D.N.Y. 2000) (no bond necessary because injunction was unlikely to harm defendants). Where a bond amount is set, that amount must encompass more than just "speculative" economic damages, and

"the burden is on the party seeking security to establish a rational basis for the amount of the proposed bond." *CJ Products LLC*, 809 F. Supp. 2d at 163 (internal quotations omitted).

Here, Sprint has made a strong showing that AT&T must be enjoined from making its 5GE Claims.  Given the strength of Sprint's case and that Sprint seeks only to prohibit AT&T from running false and misleading (not all) advertisements, including the deceptive phone icon, an injunction likely will not harm AT&T if granted.  Thus, a bond of $50,000 (at most) is appropriate here.  *See*, *e.g.*, *Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc.*, 83 F. Supp. 2d 1016, 1028 (D. Minn. 2000) (setting bond at $50,000 where plaintiff was likely to succeed on its false advertising claim and sought only to enjoin false advertising, and not all advertising); *CJ Products LLC*, 809 F. Supp. 2d at 163 (setting bond at $100,000 for Lanham Act violation); *Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc.*, 823 F. Supp. 1077, 1095 (S.D.N.Y. 1993) (issuing $25,000 bond for trademark case under Lanham Act); *Polar Corp. v. Coca-Cola Co.*, 871 F. Supp. 1520, 1522 (D. Mass. 1994) (issuing $50,000 bond for false advertising claim under Lanham Act).

## CONCLUSION

Based on the foregoing, Sprint respectfully requests this Court issue an order granting a temporary restraining order and preliminary injunction precluding AT&T from using the designation "5GE," "5G E," or "5G Evolution," or any designation containing "5G," in any and all advertisements, in any form whatsoever, for its wireless network and mobile devices, including on the screens of mobile devices connected to its wireless network, unless and until the wireless network that AT&T advertises as "5GE," "5G E," or "5G Evolution," or any designation containing "5G," complies with 3GPP 5G standards.

Dated: New York, New York
February 8, 2019

FRANKFURT KURNIT KLEIN & SELZ, P.C.

By:_____
       Craig B. Whitney
       Kimberly M. Maynard
       Lily Roos

488 Madison Avenue
New York, New York 10022
Tel.: (212) 980-0120
Fax: (212) 593-9175
cwhitney@fkks.com
kmaynard@fkks.com
lroos@fkks.com

*Attorneys for Plaintiffs Sprint Spectrum L.P.,
SprintCom, Inc. and Sprint/United Management
Company.*