UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
SPRINT SPECTRUM L.P., SPRINTCOM,  :
INC. and SPRINT/UNITED              :
MANAGEMENT COMPANY,                 :
                                 :
                Plaintiffs,       :      No. 1:19-CV-01215 (VSB)
                                 :
-v-                                 :
                                 :
AT&T MOBILITY, LLC,                 :
                                 :
                Defendant.        :
-------------------------------------------------------X

**DEFENDANT AT&T MOBILITY LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS .................................................................................... 5

    A.  A Brief History of Wireless Networks .................................................. 5

    B.  AT&T's Evolution to 5G ............................................................... 7

    C.  5G Evolution Marketing and Advertising ........................................... 8

    D.  ████████████████████ ................................................ 10

    E.  5G Evolution Results ................................................................. 12

    H.  Sprint's Own 5G Marketing ......................................................... 12

LEGAL STANDARD ...................................................................................... 14

ARGUMENT ............................................................................................... 15

    I.    Sprint Cannot Show Irreparable Harm Absent an Injunction ...................... 15

        A.  Sprint Is Not Entitled to a Presumption of Irreparable Harm ................ 15

        B.  There Is No Evidence of Harm to Sprint's Sales, Reputation, or 5G Rollout ......... 17

        C.  Sprint's Delay Indicates That Harm Is Not Imminent or Irreparable ........ 21

    II.   Sprint Is Unlikely to Succeed on the Merits of Its Claims ......................... 23

        A.  The 5G Evolution Claims Are Not False or Misleading ...................... 23

           1.  As a Matter of Law, the 5G Evolution Claims Are Not Literally False .......... 23

           2.  The 5G Evolution Claims Are Not Impliedly False ........................ 24

           3.  Sprint Cannot Show Intentional Deception .................................. 26

        B.  The 5G Evolution Claims Are Not Material to Consumers .................. 26

    III.  The Balance of Hardships Favors AT&T .............................................. 28

    IV.  An Injunction Would Disserve the Public Interest by Chilling Innovation .......... 29

    V.   Sprint's Own Conduct Would Bar Equitable Relief .................................. 29

CONCLUSION ............................................................................................ 30

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Am. Hosp. Supply Corp. v. Hosp. Prods., Ltd.*,
  780 F.2d 589 (7th Cir. 1986) ................................................................................. 28

*Apotex Inc. v. Acorda Therapeutic, Inc.*,
  823 F.3d 51 (2d Cir. 2016) ................................................................................... 27

*Cablevision Sys. Corp. v. Verizon NY Inc.*,
  119 F. Supp. 3d 39 (S.D.N.Y. 2015) .................................................................... 25

*Chobani, LLC v. Dannon Co., Inc.*,
  157 F. Supp. 3d 190 (N.D.N.Y. 2016) .................................................................. 24

*Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmbH*,
  843 F.3d 48 (2d Cir. 2016) ................................................................................... 26

*Church & Dwight Co., Inc. v. Clorox Co.*,
  840 F. Supp. 2d 717 (S.D.N.Y. 2012) .................................................................. 16

*The Comic Strip, Inc. v. Fox Tele. Stations, Inc.*,
  710 F. Supp. 976 (S.D.N.Y. 1989) ....................................................................... 22

*Danone, US, LLC v. Chobani, LLC*,
  No. 18 Civ. 11702 (CM), 2019 WL 760040 (S.D.N.Y. Jan. 23, 2019) ........................... *passim*

*Dependable Sales & Serv., Inc. v. TrueCar, Inc.*,
  311 F. Supp. 3d 653 (S.D.N.Y. 2018) ................................................................... 20

*eBay v. MercExchange LLC*,
  547 U.S. 388 (2006) ................................................................................... 15, 16

*Elrod v. Burns*,
  427 U.S. 347 (1976) .............................................................................................. 29

*Euro-Pro Operating LLC v. Euroflex Americas*,
  No. 08CV6231 (HB), 2008 WL 5137060 (S.D.N.Y. Dec. 8, 2008) ...................... 25

*Ferring Pharms., Inc. v. Watson Pharms., Inc.*,
  765 F.3d 205 (3d Cir. 2014) ................................................................................. 15

*General Mills, Inc. v. Chobani, LLC*,
  158 F. Supp. 3d 106 (N.D.N.Y. 2016) .................................................................. 16

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
  481 F.3d 60 (2d Cir. 2007) ............................................................................... 15

*Haagen–Dazs v. Frusen Gladje,*
  493 F. Supp. 73 (S.D.N.Y.1980) ...................................................................... 30

*Hanson Trust PLC v. SCM Corp.,*
  774 F.2d 47 (2d Cir. 1985) ............................................................................... 14

*Herb Reed Enters. LLC v. Fla. Entm't Mgmt., Inc.,*
  736 F.3d 1239 (9th Cir. 2013) .......................................................................... 16

*Hertz Corp. v. Avis, Inc.,*
  867 F. Supp. 208 (S.D.N.Y. 1994) ................................................................... 25

*ImOn, Inc. v. ImaginOn, Inc.,*
  90 F. Supp. 2d 345 (S.D.N.Y. 2000) ................................................................ 21

*Johnson & Johnson v. Carter-Wallace, Inc.,*
  631 F.2d 186 (2d Cir. 1980) ............................................................................. 17

*LuxSoma LLC v. Leg Res. Inc.,*
  289 F. Supp. 3d 514 (S.D.N.Y. 2018) .............................................................. 27

*Magnet Comm'cns LLC v. Magnet Comm'cns, Inc.,*
  No. 00 CIV. 5746 (RO), 2001 WL 109865 (S.D.N.Y. Sept. 19, 2001) ................. 21

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) .......................................................................................... 14

*Merck & Co. v. Mediplan Health Consulting,*
  425 F. Supp. 2d 402 (S.D.N.Y. 2006) .............................................................. 23

*Merck Eprova AG v. Gnosis S.p.A.,*
  760 F.3d 247 (2d Cir. 2014) ............................................................................. 23

*N. Am. Olive Oil Ass'n v. Kangadis Foods Inc.,*
  962 F. Supp. 2d 514 (S.D.N.Y. 2013) .............................................................. 25

*Naden v. Numerex Corp.,*
  593 F. Supp. 2d 675 (S.D.N.Y. 2009) .............................................................. 14

*Nikkal Indus., Ltd. v. Salton, Inc.,*
  735 F. Supp. 1227 (S.D.N.Y. 1990) ................................................................. 27

*Procter & Gamble Co. v. Ultreo,*
  574 F. Supp. 2d 339 (S.D.N.Y. 2008) ......................................................... 16, 25

*Procter & Gamble Pharma., Inc. v. Hoffman-La Roche Inc.,*
    2006 WL 2588002 (S.D.N.Y. Sept. 6, 2006) ........................................................................... 29

*Rodriguez ex rel. Rodriguez v. DeBuono,*
    175 F.3d 227 (2d Cir. 1999) ......................................................................................... 14, 15

*S.C. Johnson & Son, Inc. v. Clorox Co.,*
    930 F. Supp. 753 (E.D.N.Y. 1996) .................................................................................... 16

*Salinger v. Colting,*
    607 F.3d 68 (2d Cir. 2010) ............................................................................................... 15

*Sanford L.P., et al. v. Esselte AB,*
    No. 14-cv-7616, Memo. Order, slip. op. (S.D.N.Y. Sept. 16, 2015)..................................... 15

*Schick Mfg., Inc. v. Gillette Co.,*
    372 F. Supp. 2d 273 (D. Conn. 2005).................................................................. 16, 19, 21

*Stokely-Van Camp, Inc. v. Coca-Cola Co.,*
    646 F. Supp. 2d 510 (S.D.N.Y. 2009)..........................................................................*passim*

*Tiffany (NJ) Inc. v. eBay Inc.,*
    600 F.3d 93 (2d Cir. 2010)............................................................................................... 24

*Time Warner Cable, Inc. v. DIRECTV, Inc.,*
    497 F.3d 144 (2d Cir. 2010) .......................................................................................*passim*

*Tom Doherty Assocs., Inc. v. Saban Ent'mt, Inc.,*
    60 F.3d 27 (2d Cir. 1995) ................................................................................................ 22

*Tough Traveler, Ltd. v. Outbound Prods.,*
    60 F.3d 964 (2d Cir. 1995) ............................................................................................. 21

*Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.,*
    277 F.3d 253 (2d Cir. 2002) ............................................................................................ 20

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.,*
    423 F.3d 137 (2d Cir. 2005) ............................................................................................ 21

*Winter v. Nat'l Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)....................................................................................................... 14, 28

**Statutes**

15 U.S.C. § 1125(a)...........................................................................................................*passim*

**Other Authorities**

John Leubsdorf, *The Standard for Preliminary Injunctions*, 91 HARV. L. REV. 525, 540–41 (1978)......................................................................................................................28

## PRELIMINARY STATEMENT

For more than two years, AT&T has invested ▮▮▮▮▮▮ dollars in enhancements to its wireless network on its path to the next generation of technology known as "5G." While the other three major wireless carriers pursued different strategies, AT&T was overt and transparent about its own: "5G Evolution" would provide a substantial improvement in customer experience immediately while also laying the foundation for AT&T's eventual nationwide 5G network.

Outwardly, Sprint almost immediately began mocking AT&T with its then-CEO's April 2017 tweet calling 5G Evolution "fake 5G." Internally at Sprint, however, ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Almost two years after AT&T began its 5G Evolution investment, it received the 2018 award for "Best US Network" from Global Wireless Solutions, Inc. based on "the most comprehensive study into wireless connectivity to date." After AT&T went to market with its "Best Network" claims and began advertising its 5G Evolution capabilities, Sprint filed this lawsuit claiming it will be "irreparably harmed" by that advertising. AT&T will demonstrate— ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—exactly what changed.

Regardless of its motive, Sprint's claim against AT&T for falsely advertising "5G Evolution" advances a novel theory. Stripped of its excess, Sprint's claim is that *the name* that AT&T chose to describe its significant network enhancements—the culmination of more than ▮▮ billion in investment over two years—is responsible ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ On that theory, Sprint asks this

1

Court to order a nationwide injunction that precludes AT&T from advertising 5G Evolution at all[1]—and from informing its customers that they are receiving AT&T's best experience—until AT&T rolls out "true" 5G.

Unpacking Sprint's allegations reveals the gaping holes in its legal argument. *First*, Sprint contends—based on results from flawed, litigation-driven surveys—that consumers who view AT&T's "5G Evolution" ads believe that AT&T is offering "5G" technology "or the equivalent." *Second*, Sprint argues that 5G Evolution is not "true 5G" because it does not comply with specifications for 5G technology propounded by 3GPP in its "Release 15." Of course, Sprint fails to connect the dots with the final, and necessary, premise for a false advertising claim: *that consumers expect "industry standards" and take away the impression that 5G Evolution complies with those standards.*

False advertising cases are decided, first, by the claim actually made in the advertisement and, second, by evidence of consumers' interpretation of that claim. A plaintiff cannot impute a claim that its competitor does not make into the advertising and then measure that fictional claim against expectations that consumers do not have. Sprint's entire case fails on its core theory alone.

Equally flawed is Sprint's claim of irreparable harm. In this district, inexcusable delay in seeking injunctive relief is a material factor that courts consider in determining whether claimed "harm" is "imminent and irreparable." Sprint's CEO first mocked AT&T's announcement of 5G

---

[1] While Sprint's Original Complaint was targeted primarily at AT&T's "OK Network" ads on television and in digital media—which briefly referenced "*5G E*" or, in a few cases, "5GE" in the end cards—its Amended Complaint, ████████████████████ are clear that Sprint objects just as vehemently to AT&T's "5G Evolution" advertising that began airing in February 2019, complete with the voice-over "The first step to 5G." Sprint even demands that AT&T be enjoined from referring to "5G Evolution" on its consumer-facing website where it explains its varying technologies.

Evolution on Twitter in *April 2017*. As AT&T continued to invest ███████ 5G Evolution and chronicled its expansion in myriad press releases and on its website, ████████████████ ███████████████████████████ Only after AT&T had invested ██████████ in its network and spent ████████████ on nationwide advertising for 5G Evolution did Sprint act ████████████ ██████████████████████████████████████████████████████████ by filing this litigation. That delay is extremely harmful to AT&T and cannot be excused by Sprint's contention ██████████████████████████████████████████████████

Moreover, Sprint's claims in this proceeding that it will be irreparably harmed by AT&T's advertising clash directly with its sworn testimony to the federal government in support of its proposed merger with T-Mobile. Among other material contentions, Sprint testified that:

- It cannot compete with AT&T and Verizon as a standalone company;

- It lacks the resources to alter consumer perception that its network is unreliable;

- Its own survey data shows that it "consistently ranked last in customer perception of which wireless competitor provides the best value";

- Consumers' poor perception of its network causes Sprint to have the highest "churn" of customers in the industry; and

- Sprint is the only carrier with a rising churn rate.

Sprint also testified that it anticipated "a limited 5G build over time that will lack broad coverage, *both due to limitations on Sprint's 2.5GHz spectrum and Sprint's financial capabilities*." Finally, Sprint swore in June 2018 that, if the merger with T-Mobile were not approved, the gap between Sprint and AT&T would continue to grow.

Sprint's sworn testimony to the federal government—████████████████████ ████████████████—is binding as a matter of law, and Sprint is estopped from contradicting it. None of Sprint's testimony about losing more market share and customers to AT&T and its

other competitors over time has anything to do with AT&T's advertising. For Sprint to now suggest that it is losing customers to AT&T due to advertising, and that it is suffering "irreparable harm," is disingenuous.

As to the balance of hardships, AT&T has provided expert testimony, supported by data and other evidence, ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████ This quantified harm far outweighs Sprint's conjecture as to its unidentified lost customers and nebulous harm to its future, limited 5G "rollout." The public interest also favors fierce competition in the wireless industry and would not be served by a nationwide injunction that prevents AT&T from advertising its best network experience and informing its customers when they can benefit from that experience.

Finally, it is paramount in an equitable proceeding that a plaintiff itself do equity and that it not have engaged in the same conduct it complains of. Yet Sprint's unmitigated attack on AT&T's 5G Evolution service—which is real technology, being deployed today, with substantial customer benefit—ignores that Sprint has publicly touted its 5G network in consumer-facing advertising, complete with a phone showing a "5G" indicator connected to Sprint's "5G network" as of February 2019. Sprint's ads also told the consuming public that "It's time to power up America's Mobile 5G Network." Of course, it is not time to do so, and was not in February 2019, as ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████

Moreover, Sprint's hypocrisy in complaining about the marketing of network technology that does not comply with industry standards cannot go unmentioned. In the industry-wide transition from 3G to 4G, Sprint began marketing its "WiMAX" technology as "4G" when it was

not, and continued to do so even after the standards-setting body—the ITU—had determined that its technology did *not* qualify as 4G. For Sprint to point the finger at AT&T for advertising 5G Evolution, where AT&T never claimed it as "standards-based" 5G, is absurd.

AT&T will show the Court—████████████████████████████████—what this case is really about. Discovery has revealed that ████████████████████████████████

████████████████████████████████████████████████████████████

The games should now end.

## STATEMENT OF FACTS

### A. A Brief History of Wireless Networks

Historically, each of the wireless carriers has arranged their network in a different manner based on the strength of their wireless assets, including their spectral holdings. Mansfield Decl. ¶¶ 9–10. For example, in the transition from 3G to 4G a decade ago, Sprint marketed its WiMAX technology as a 4G network, whereas AT&T, Verizon, and T-Mobile marketed 4G networks based on 3GPP specifications, including Long Term Evolution (LTE). *Id.* ¶¶ 20–22████████████ ██████ Eventually, the International Telecommunications Union (ITU)—a United Nations

agency that sets international telecom standards—determined that any "evolved 3G technologies providing a substantial level of improvement in performance and capabilities," including WiMAX and LTE, could be referred to as "4G." DX-111; Mansfield Decl. ¶ 21.

Several years ago, the ITU issued a new set of requirements for 5G called IMT-2020. DX-124. The IMT-2020 standards set performance goals for 5G networks on objective criteria such as peak data rate, spectral efficiency, and user latency. *Id.* Various organizations, including 3GPP and IEEE, are developing technical specifications to submit to the ITU in late 2020 for recognition as a technology capable of meeting the IMT-2020 standards. Mansfield Decl. ¶¶ 26–27; ███████████ ███████████ Release 15 is the first of two parts that 3GPP will submit to the ITU. DX-110; DX-126. Participants in the mobile wireless industry rely on the 3GPP specifications to develop and build wireless technology that is interoperable, device portable, and backwards and forwards compatible. Mansfield Decl. ¶ 11. 3GPP, however, is not a standards body, and there is no legal requirement to implement 3GPP specifications. *Id.* ¶ 18; ████████████████████

As in the run-up to 4G, the major U.S. mobile carriers are each implementing network enhancements and marketing their progress to 5G. DX-125. Verizon claimed to be the "first to 5G" after launching a fixed wireless service using technology based on Verizon's own, proprietary 5G specifications ("5G UWB"). DX-127. T-Mobile claims to have focused on deploying high-data-capacity millimeter wave spectrum. ███████████████████ And Sprint put its chips behind mid-band 2.5 GHz spectrum and "Massive MIMO" technology, while pushing a message that its network is "true 5G" (despite not using millimeter wave technology or materially improving latency), ostensibly because its network includes Release 15-described elements. Am. Compl. [Dkt. 48], at 5.

6

## B. AT&T's Evolution to 5G

In 2016, AT&T began developing its own 5G plans. Christopher Decl. ¶ 16. AT&T recognized that 5G would not replace the current LTE technology, but that LTE would continue to evolve on the path to 5G and the two would be tightly integrated. *Id.* ¶ 17; Biry Decl. ¶ 7. The building blocks and key components planned for 5G—that is, the anchor for nationwide 5G deployment—would first show up in the evolution from LTE to 5G. Christopher Decl. ¶ 17. Thus, AT&T focused on laying the foundation for its 5G network while also delivering substantially faster speeds and a better customer experience as technology enhancements were implemented. *Id.* ¶ 19; Mansfield Decl. ¶ 22. This strategy was called "5G Evolution." Christopher Decl. ¶ 19.



AT&T spent nearly ███████ in network upgrades in 2017 and ███████ more in 2018. *Id.* ¶ 7. Among other things, these investments paid for ███████

## C. 5G Evolution Marketing and Advertising

Having aligned on a roadmap for 5G Evolution, AT&T began to explore potential ways for messaging the enhanced consumer experience expected from its multibillion-dollar investment in network upgrades. Christopher Decl. ¶ 21

AT&T first announced 5G Evolution publicly on January 4, 2017 at a prominent industry convention, identifying both the specific technologies and the initial deployment plan. Christopher Decl. ¶ 27. As AT&T explained in a press release issued the same day, "5G Evolution will pave the way to the next-generation of higher speeds for customers" and will be the "foundation for our evolution to 5G." DX-045. Throughout 2017 and 2018, AT&T issued numerous press releases to announce 5G Evolution availability in more markets and the release of additional 5G Evolution-capable devices. Christopher Decl. ¶ 28; DX-046 – DX-053. AT&T also ran television advertisements promoting its "Evolution to 5G" between April 2017 and January 2018. Christopher Decl. ¶ 29; DX-054. Over the last two years, 5G Evolution has been widely discussed in the trade press and at industry events. Christopher Decl. ¶ 28.

In April 2017, Sprint's then-CEO Marcelo Claure tweeted in response to a press report about 5G Evolution that AT&T was "build[ing] a fake 5G network." DX-098.



In early 2018, in anticipation of both nationwide 5G Evolution coverage and the deployment of AT&T's first mobile 5G offering (5G+),

While AT&T was implementing AT&T was named America's Best Network by Global Wireless Solutions (GWS) for 2018. DX-60. GWS, a leading independent test firm, named AT&T the best wireless network based on 8 million tests in more than 500 markets across the country, focusing on dimensions that consumers deemed important, including data speed, video performance, and voice performance. Christopher Decl. ¶ 37. The GWS award validated the that AT&T had spent on its network in 2017 and 2018 and provided AT&T with a powerful network message to advertise to consumers. *Id.* ¶¶ 32, 37. In December 2018, AT&T took this message to market with a series of television commercials (the "OK Network Commercials") that promoted AT&T as "America's Best Network" based on the GWS award. *Id.* ¶¶ 37, 40.

The OK Network Commercials open with a humorous vignette about a person who is "just OK" at his or her job (e.g., a doctor, tattoo artist, babysitter, or coach) with the tagline that "Just

9

OK is not OK." *Id.* ¶ 36. The commercials then include a voiceover and end cards stating, "AT&T is America's best wireless network according to America's biggest test." *Id.* The commercials conclude with a separate voiceover stating, "Now with 5G E" and a "*5G E*" logo displayed on the end card. *Id.* AT&T included 5G Evolution in the OK Network Commercials in order to tell consumers about the latest technological advancements on which AT&T spent ██████████ to deliver a superior customer experience. *Id.* ¶ 38. Although the Best Network and 5G Evolution claims in the OK Network Commercials are separate, AT&T hoped that customers would want to learn more about what AT&T is doing to improve its network. *Id.*

**D.** ███████████████████████



In fact, on January 8, 2019, Sprint, T-Mobile, and Verizon all made disparaging statements about AT&T's OK Network Commercials. DX-062.



On January 9, Sprint's then-CEO, Marcel Claure, posted a link to The Verge article and tweeted, "Two weeks into the new year and @ATT is already misleading its customers. That has to be a record." DX-129. ███████████████████████████



Contrary to the disparaging statements by Sprint and AT&T's other competitors, AT&T never intended or expected for the OK Network Commercials to lead consumers to mistake 5G Evolution for 5G. Christopher Decl. ¶ 45. Nevertheless, AT&T did not want even a suggestion that consumers in the marketplace were mistaking 5G Evolution for 5G. *Id.* In fact, AT&T differentiates between its own 5G Evolution and 5G offerings in marketing and advertising materials. *Id.* ¶¶ 45–46; *see, e.g.*, DX-063 (January 2018 press release that refers separately to 5G based on "new radio (NR) standards" as distinct from "5G Evolution technology").

Before Sprint filed this lawsuit, ███████████████████████████████████████████████████████████████████████████████ AT&T decided to revise the OK Network Commercials to provide slight additional detail about 5G Evolution. Christopher Decl. ¶ 47. In the new OK Network commercials (the "Revised Commercials"), AT&T replaced "5G E" with the

full "5G Evolution" name on the end card and changed the voiceover to state, "Now with 5G Evolution—the first step to 5G." *Id.* ¶ 48. The Revised Commercials also invite consumers to "Learn more at att.com/5GEvolution." *Id.* This page explains, "5G Evolution is the first step on the road to 5G. We're starting by enabling faster speeds on our existing LTE network—up to 2x faster than standard LTE." DX-067.

The Revised Commercials began airing on February 15, 2019.[2] Christopher Decl. ¶ 50.

### E.  5G Evolution Results

Consistent with AT&T's advertising, and contrary to the denigrating remarks from its competitors, 5G Evolution is delivering faster speeds and a superior consumer experience to competitors' LTE networks. In fact, recent data from Ookla, an independent company that compiles data from consumer speed tests, confirms that AT&T's network has become the fastest in the country since the introduction of 5G Evolution. DX-070, at ATTM-038038; DX-120; Mansfield Decl. ¶¶ 38–39; Christopher Decl. ¶ 54.

### F.  Sprint's Own 5G Marketing

Over the last two years, Sprint has marketed its "Next Gen Network,"

---

[2] The original OK Network Commercials are no longer on the air. Hence, they are not relevant to the request for preliminary injunctive relief before the Court. *See Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 524–25 (S.D.N.Y. 2009) (finding that request for preliminary injunction against discontinued ads was "moot").

In addition, for much of 2018,

Sprint ultimately branded its massive MIMO capability as "LTE Advanced,"

Additionally, in February 2019, Sprint began advertising on YouTube that it currently offers "America's Mobile 5G Network,"

Sprint even promoted LG phones connected to its "5G" network—complete with a "5G" indicator—

Sprint claims that it will launch "true 5G" later this year in parts of nine U.S. markets and that it expects to reap significant financial rewards and revitalize its reputation with consumers by doing so. MOL at 5, 21.

13

Additionally, over the last year, Sprint has told the federal government in connection with the T-Mobile merger that Sprint "doesn't have the resources to build a 5G network to provide the necessary competition against [] AT&T and Verizon." DX-119, at ATTM-028343–44. Sprint also represented that "building ubiquitous nationwide 5G coverage using only Sprint's 2.5 GHz spectrum would be impractical and economically infeasible." DX-117, at ATTM-028268. Even in the nine markets where Sprint expects to roll out 5G,

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). It is "one of the most drastic tools in the arsenal of judicial remedies." *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985). "The party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that the plaintiff is likely to suffer irreparable harm absent a preliminary injunction; (3) that the balance of hardships favors the plaintiff; and (4) that a preliminary injunction is in the public interest." *Danone, US, LLC v. Chobani, LLC*, 2019 WL 760040, *6 (S.D.N.Y. Jan. 23, 2019). The elements must be proven "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction" and must be established before the other elements will be considered. *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233–34 (2d Cir. 1999) (per curiam) (internal quotation marks omitted); *accord Naden v. Numerex Corp.*, 593 F. Supp. 2d 675, 680 (S.D.N.Y. 2009)

14

(noting that "[t]he threat of irreparable injury is a sine qua non") (*citing Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981)). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).

As this Court has previously explained, "in the Second Circuit, the general rule is that 'the moving party must first demonstrate that [irreparable] injury is likely before the other requirements for the issuance of an injunction will be considered.'" *See Sanford L.P., et al. v. Esselte AB*, No. 14-cv-7616, Memorandum and Order, slip op. (S.D.N.Y. Sept. 16, 2015) (quoting *Rodriguez*, 175 F.3d at 234 (internal quotation marks omitted)); *accord Grand River*, 481 F.3d at 66–67. AT&T therefore addresses the lack of irreparable harm before addressing the merits and other elements.

## ARGUMENT

### I.      Sprint Cannot Show Irreparable Harm Absent an Injunction

Sprint cannot show irreparable harm because (A) it is not entitled to a presumption of irreparable harm; (B) there is no evidence of harm caused by the allegedly false claims and Sprint's sales position, business efforts, or reputation (and, even if there were, that harm would be calculable in damages); and (C) Sprint's delay in bringing suit indicates that the alleged harm is not imminent or irreparable.

#### A. Sprint Is Not Entitled to a Presumption of Irreparable Harm

Under current law, the "court must not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (quoting *eBay v. MercExchange LLC*, 547 U.S. 388, 391–94 (2006)); *see also Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 216 (3d Cir. 2014) ("no presumption of irreparable

15

harm" in Lanham Act cases after *eBay*); *Herb Reed Enters. LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013) (same).

Even if a presumption were still allowed, it would not apply here. "Historically, a plaintiff who successfully demonstrated a likelihood of success in showing the literal falsity of a 'defendant's comparative advertisement mentioning the plaintiff's product by name' was entitled to a presumption of irreparable harm." *General Mills, Inc. v. Chobani, LLC*, 158 F. Supp. 3d 106, 120 (N.D.N.Y. 2016) (quotation omitted). Here, the accused advertisements do not draw any comparisons to Sprint. *Compare S.C. Johnson & Son, Inc. v. Clorox Co.*, 930 F. Supp. 753, 756, 785–86 (E.D.N.Y. 1996) (finding comparative claim where defendant compared its product to that of the "other guys" while displaying plaintiff's product), *with Schick Mfg., Inc. v. Gillette Co.*, 372 F. Supp. 2d 273, 282 (D. Conn. 2005) (finding no comparative claim where "the challenged advertising [did not] mention[] a competitor"). In fact, the advertisements say nothing at all about Sprint or its products.

Consumers do not understand the ads to disparage Sprint; not one participant in Mr. Poret's or Dr. Simonson's surveys said such a thing. Simonson Decl. ¶¶ 36–48; Ex. 36 to Report of Hal Poret, at 16–22; *see Procter & Gamble Co. v. Ultreo Inc.*, 74 F. Supp. 2d 339, 347 (S.D.N.Y. 2008) (no presumption where it was not "obvious to the viewing public that the advertisement [was] targeted at the plaintiff"). Furthermore, the wireless market is not "binary," and the ads do not refer to unique features of Sprint. *See Time Warner*, 497 F.3d at 162 (presuming harm in "binary" market where defendant referenced "cable" which was "synonymous with" plaintiff); *Church & Dwight Co., Inc. v. Clorox Co.*, 840 F. Supp. 2d 717, 723 (S.D.N.Y. 2012) (presuming harm where defendant referenced baking soda and consumers "overwhelmingly identif[ied] baking soda" with plaintiff).

16

Although some of the ads state the fact that AT&T has the "best network according to America's biggest test"—which AT&T substantiates—this statement refers to the objective findings of GWS, as both the voiceover and a notation on the screen explain. "Now with 5G E" or "Now with 5G Evolution—the first step to 5G" cannot be construed as making a claim that 5G E or 5G Evolution are the reason that AT&T is the best network. As such, to the extent the ads make any comparative claims at all, those claims have nothing to do with the alleged falsity.

### B. There Is No Evidence of Harm to Sprint's Sales, Reputation, or 5G Rollout

"In the absence of a presumption, the likelihood of irreparable harm 'must be demonstrated in some manner.'" *Stokely-Van Camp*, 646 F. Supp. 2d at 531 (quoting *Time Warner*). In particular, the plaintiff "must submit proof which provides a reasonable basis for believing that the [allegedly] false advertising will likely cause it injury." *Time Warner*, 497 F.3d at 161. The evidence must include "something more than [the] plaintiff's mere subjective belief that it is injured or likely to be damaged." *Id.*

Sprint's claim of irreparable harm is exceptionally thin and rests on its own subjective beliefs rather than any evidence of causation. However, courts require evidence "to prove a likelihood of competitive injury resulting from the [defendant's] advertising"; for example, evidence that plaintiff's sales had "in fact declined," testimony by customers that switched from plaintiff to defendant in reliance on the allegedly false claims, or surveys showing that the defendant's ads caused consumers to devalue plaintiff's products. *See Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190–91 (2d Cir. 1980). Sprint offers plenty of speculation, but no evidence on these points.

AT&T sought specifically to inquire into Sprint's alleged irreparable harm by noticing a Rule 30(b)(6) deposition for a Sprint witness to attest to "[t]he alleged irreparable harm suffered by Sprint, or that Sprint expects it may suffer, including without limitation *loss of customers or*

17

*market share or damage to goodwill or reputation*, as a result of the 5G Evolution Ads or the '5G E' Network Indicator." DX-097, at 5. The topic specifically included "Sprint's churn (or 'port') data, anticipated churn, historical churn, any increase in customer churn specifically related to the 5G Evolution Ads or the '5G E' Network indicator, and Sprint's contentions as to alleged money damages." *Id.* Sprint designated James Curran to testify on this topic.



But even the new testimony cannot save Sprint's claims.

*See Danone*, 2019 WL 760040, *12 (finding no irreparable harm where plaintiff did not "offer any evidence, from consumers or otherwise, that [it] lost any sales, or that (if it did) those losses were attributable" to the false claim); *Ultreo*, 574 F. Supp. 2d at 348–50 (finding no irreparable harm where there was "no evidence that establishes a logical causal connection between the alleged false advertising and [plaintiff's] claims of lost sales"). "Given [Sprint's] research capabilities and research, its failure to present any concrete evidence of harm or likely harm is striking." *See Stokely-Van Camp*, 646 F. Supp. 2d at 532.



*Danone*, 2019 WL 760040, at *12; DX-001, at 51–52.

*cf. Schick*, 372 F. Supp. 2d at 284 (finding irreparable harm where plaintiff had a "severe decline" in sales after false ads ran); *S.C. Johnson*, 930 F. Supp. at 786 (finding irreparable harm where "in the [defendant's] heavy-advertised markets, [plaintiff] has lost market share since the Commercial began airing").

Moreover, Sprint cannot explain how losing customers to AT&T, which it has been doing continuously for years, is somehow attributable to advertising that AT&T began running in December 2018. the sworn testimony provided by its Chief Commercial Officer, Brandon "Dow" Draper, that Sprint's loss of customers to AT&T and Verizon was due to Sprint's poor network quality, customer perception of that lack of quality, and insufficient resources to improve its network. *See* DX-105.

In any event, this granular customer data—as well as customer exit interviews and marketing survey work—that Sprint, AT&T, and other carriers maintain in the ordinary course

---

[3] Customers' preference of AT&T can also be attributed to other causes, such as AT&T's recent recognition as having the best and fastest nationwide network and recent sales promotions such as a recent "buy one get one" offer for new Samsung devices. *See Stokely-Van Camp*, 646 F. Supp. 2d at 532 (explaining that plaintiff cannot "extrapolate" harm where consumer choice was driven by valid product differences); *Ultreo*, 574 F. Supp. 2d at 349 (finding no showing of irreparable harm where sales numbers were "wholly unrelated to the advertising claims").

of business could be used to calculate alleged monetary damages if harm actually existed. *See* DX-001, at 50–60. "A damages expert may isolate losses caused by the false advertisements by controlling for external factors and market forces and various lawful promotional activity that influenced consumers." *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 311 F. Supp. 3d 653, 659 (S.D.N.Y. 2018). Of course, injunctive relief is inappropriate where damages can compensate harm. *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 277 F.3d 253, 260 (2d Cir. 2002).

Unable to show lost sales, Sprint advances a speculative theory that AT&T's 5G Evolution marketing will somehow affect Sprint's own, limited 5G rollout to nine metropolitan "clusters."

these assertions are speculative and self-serving. This is what the Second Circuit had in mind when it held that irreparable harm requires "something more than [the] plaintiff's mere subjective belief that it is injured or likely to be damaged." *Time Warner*, 497 F.3d at 161.

Finally, with respect to harm to its brand                                    On the one hand, Sprint has represented to the federal government that it lacks the ability to develop a competitive 5G network absent a merger with T-Mobile or to effectively compete with AT&T. On the other hand, if the T-Mobile merger is approved, Sprint will become part of "The New T-Mobile" and no longer exist.

Either way, Sprint cannot logically claim irreparable harm to its business or reputation in relation to its alleged 5G rollout.

### C. Sprint's Delay Indicates That Harm Is Not Imminent or Irreparable

Delay "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995). "As a factual matter, such delay suggests that irreparable harm does not exist as the moving party, for some significant period of time, declined to exercise rights that may have mitigated the irreparable harm it was suffering." *Schick*, 372 F. Supp. 2d at 284; *see also Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144–45 (2d Cir. 2005) (explaining that delay is excused only when there is a "good reason for it").

Sprint has known about the basis for its claims since at least April 2017 when its then-CEO Marcelo Claure tweeted that 5G Evolution is "fake 5G." DX-098.

Sprint's "delay in seeking injunctive relief, while not dispositive, weighs strongly against a finding of irreparable harm." *See Ultreo*, 574 F. Supp. 2d at 354 (six-month delay showed no irreparable harm); *Magnet Comm'cns LLC v. Magnet Comm'cns, Inc.*, 2001 WL 109865, *1 (S.D.N.Y. Sept. 19, 2001) (twelve-week delay); *ImOn, Inc. v. ImaginOn, Inc.*, 90 F. Supp. 2d 345,

350 (S.D.N.Y. 2000) (eighteen-week delay); *The Comic Strip, Inc. v. Fox Tele. Stations, Inc.*, 710 F. Supp. 976, 981 (S.D.N.Y. 1989) (three months).

Sprint's delay is not excused by the fact that 5G Evolution advertisements began running in December 2018 on television nationwide. Its requested injunction covers far more than those advertisements, including marketing on AT&T's "website" and "social media accounts" that has been available for several months. Moreover, the sought injunction is not limited to recent advertisements but instead would bar AT&T from "using the designation '5GE,' '5G E,' or '5G Evolution,' or any designation containing '5G,' in any and all advertisements, in any form whatsoever . . . unless and until the wireless network that AT&T advertises . . . complies with 3GPP 5G standards." MOL at 25.

Instead of acting to mitigate any claimed harm early, Sprint sat on its hands until AT&T had invested ███████ to make network upgrades and spent ███████ dollars on costly advertising space. *See Tom Doherty Assocs., Inc. v. Saban Ent'mt, Inc.*, 60 F.3d 27, 39 (2d Cir. 1995) (explaining that whether "the defendant had taken costly steps during the period of delay that would be at least temporarily undone by injunctive relief" is a relevant factor in assessing delay). ███████ These tactics weigh strongly against an award of equitable relief.

22

**II.    Sprint Is Unlikely to Succeed on the Merits of Its Claims**

Sprint is unlikely to succeed because (A) the 5G Evolution claims are not false or misleading; and (B) the 5G Evolution claims are not material to consumers.[4]

**A.  The 5G Evolution Claims Are Not False or Misleading**

Under Section 43(a) of the Lanham Act, the plaintiff must show that the defendant made a false or misleading statement in advertising. *See Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014). "The Lanham Act proscribes two types of false advertisements: those that are literally false and those that are technically true but likely to mislead, *i.e.*, 'impliedly false.'" *Danone*, 2019 WL 760040, at *7. For literal falsity, the message cannot be "susceptible to more than one reasonable interpretation." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2010). For implied falsity, the plaintiff must provide extrinsic evidence of consumer confusion. *Id.* at 153.

Sprint's literal falsity claims legally must fail because its own alleged survey evidence shows that the term "5G Evolution" is ambiguous and susceptible to different reasonable interpretations, and its implied falsity claims are unlikely to succeed because they rely on flawed surveys and ignore that consumers do not expect industry standards for 5G.

**1.  As a Matter of Law, the 5G Evolution Claims Are Not Literally False**

Sprint cannot prove literal falsity because its own survey evidence shows that the term "5G Evolution" is ambiguous. In particular, Sprint's surveys themselves—even ignoring their flaws—show that about 50% of survey respondents took away the allegedly false message from the tested

---

[4] Because "[t]he federal standards applicable to false advertising are substantially similar to the standards applicable to claims under the New York deceptive trade practices statute," this memorandum does not separately analyze the state-law claims. *Merck & Co. v. Mediplan Health Consulting*, 425 F. Supp. 2d 402, 410 n.6 (S.D.N.Y. 2006).

ad. In a nearly identical situation, Chief Judge McMahon held that the plaintiff had "not established a likelihood of success on the merits of a literal falsity claim." *Danone*, 2019 WL 760040, at *7-8 (citing *Time Warner*, 497 F.3d at 158). Such surveys—though potentially helpful to the plaintiff on implied falsity grounds—"come at a cost" because the Court "simply cannot say" claims are unambiguously false when plaintiff's own surveys show that the claims are susceptible to more than one reasonable interpretation. *Id.* at *8. This fact alone defeats the literal falsity claims "as a matter of law." *Id.*

In addition, the Court can tell from a facial review of the 5G Evolution claims that they are susceptible to multiple interpretations. The term "Evolution" commonly means gradual progress towards something. "5G" does not appear in the dictionary and has no "common meaning." A reasonable consumer could draw the entirely true and accurate reading that AT&T's network is evolving to 5G rather than the allegedly false message that 5G Evolution is standards-based 5G. Moreover, the term "5G" itself is an ambiguous term that is subject to myriad interpretations, as

### 2. The 5G Evolution Claims Are Not Impliedly False

"The question in [implied falsity] cases is—what does the person to whom the advertisement is addressed find to be the message?" *Chobani, LLC v. Dannon Co., Inc.*, 157 F. Supp. 3d 190, 200 (N.D.N.Y. 2016) (quoting *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992)). As such, the plaintiff must show, "by extrinsic evidence," that "a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 113 (2d Cir. 2010).

24

Sprint offers no extrinsic evidence to show that consumers believe 5G Evolution meets an industry technical standard, much less Release 15. Instead, its whole case rests on Release 15 allegedly defining "5G" to industry insiders. But what matters are the beliefs of reasonable consumers. *See, e.g., Cablevision Sys. Corp. v. Verizon NY Inc.*, 119 F. Supp. 3d 39, 50 (S.D.N.Y. 2015) ("common parlance" prevailed over "technical" meaning); *N. Am. Olive Oil Ass'n v. Kangadis Foods Inc.*, 962 F. Supp. 2d 514, 519–20 (S.D.N.Y. Apr. 25, 2013) (consumer reading governed over that of "industry insiders"); *Euro-Pro Operating LLC v. Euroflex Americas*, 2008 WL 5137060, *7 & n.5 (S.D.N.Y. Dec. 8, 2008) ("consumers' interpretation of [a] term governs" over "specific meaning in the field").

Sprint also relies on a flawed survey that lacked a valid control, improperly coded responses, and used biased questions. DX-003, at 23–35; *see also Hertz Corp. v. Avis, Inc.*, 867 F. Supp. 208, 213 (S.D.N.Y. 1994) (denying preliminary injunction where plaintiff's "survey was not properly conducted" and "inherently suggestive"). The lack of a valid control is especially notable because "[c]ontrols are an essential feature of reliable survey evidence" that "enable the surveyor to separate the wheat (the effect of the advertisement, alone, on the participant) from the chaff (the effect of the participant's prior knowledge and/or prior (mis)conceptions." *Procter & Gamble*, 574 F. Supp. at 351. Lacking a valid control that showed the term "5G" in a non-deceptive way, Sprint's surveys could not differentiate confusion caused by the ad and prior misconceptions among consumers about the meaning of the term "5G."

Even if Sprint's survey results were taken at face value, the surveys did not test how consumers understand "5G" or establish that consumers expect technical standards. Poret Dep. at 39:19–41:13. In fact, the evidence clearly shows that consumers do *not* associate "5G" with technical standards. *None* of Mr. Poret's survey respondents mentioned such standards in open-

ended responses, and AT&T's survey expert likewise found no such association. DX-001, at 36–48.



is also consistent with the findings of AT&T's survey expert, Dr. Itamar Simonson, who concluded based on two different surveys that (i) the accused commercials "do not convey that consumers that A&T currently has a 5G network or service"; (ii) "the mere mention of "5G" in connection with AT&T's current 'Just OK is not OK' commercial does not communicate to consumers that AT&T's '5G Evolution' network complies with any industry or technical standards"; and (iii) "5G" has little, if any, meaning to most consumers. Simonson Decl. ¶¶ 7–8; DX-003.

### 3.  Sprint Cannot Show Intentional Deception



None of this evidence suggests that AT&T intended for customers to think that 5G Evolution meets an industry technical standard. *Cf. Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmbH*, 843 F.3d 48, 65 (2d

Cir. 2016) (discussing evidence that defendant "intended to deceive the public into believing that the Product provides a measurement of weeks-pregnant consistent with the metric used by doctors").

### B. The 5G Evolution Claims Are Not Material to Consumers

Sprint cannot prove that the alleged false claim "involve[s] an inherent or material quality of the product." *See Apotex Inc. v. Acorda Therapeutic, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016). "Materiality" means the allegedly false claim is "likely to influence purchasing decisions." *Id.* (quoting *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997)). Thus, the plaintiff "must [] show that 'the alleged inaccuracy in the statement at issue would affect the purchasing decisions of consumers.'" *LuxSoma LLC v. Leg Res. Inc.*, 289 F. Supp. 3d 514, 526 (S.D.N.Y. 2018) (quoting *Merck Eprova AG v. Brookstone Pharmas., LLC*, 920 F. Supp. 2d 404, 416 (S.D.N.Y. 2013)).

But there is no evidence that consumers believe that "5G Evolution" refers to technology related to AT&T's offering of wireless services or, more importantly, that the underlying technology used to deliver the service (i.e. "Release 15" technologies or otherwise) matters to consumers. *Cf. Nikkal Indus., Ltd. v. Salton, Inc.*, 735 F. Supp. 1227, 1237 (S.D.N.Y. 1990) (finding that false advertising claims were not actionable where "nothing in the record suggests that the [product claim] was of great importance to the buying public"). And Sprint has not identified any customers allegedly deceived into purchasing services from AT&T based on a mistaken belief about the technology underlying the 5G Evolution network.

To the contrary, AT&T's survey expert, Dr. Simonson, conducted a simple survey that demonstrated the immateriality of the claims to consumers. Dr. Simonson showed a test group a

5G Evolution advertisement and a control group an altered version with the "5G Evolution" end card and voiceover changed to say "LTE Advanced" (as Sprint alleges properly describes 5G Evolution). The survey found *no statistically significant difference* in the likelihood of consumers' purchasing services from AT&T—regardless whether the network was referred to as 5G Evolution or LTE Advanced. Further, among the test group, just 1.4% of respondents mentioned anything about 5G Evolution or 5G as being a factor that would influence their purchase. DX-001, at 53–60. Given this evidence, and the lack of contrary evidence to show materiality, Sprint likely cannot meet its burden.

### III.   The Balance of Hardships Favors AT&T

In considering an injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quotation omitted). Because preliminary injunctions are decided on an incomplete record, the Court "should aim to minimize the probable irreparable loss of rights caused by errors incident to hasty decision." John Leubsdorf, *The Standard for Preliminary Injunctions*, 91 HARV. L. REV. 525, 540–41 (1978). In other words, the Court should weigh the potential harm to defendant of an "erroneous grant" against the potential harm to plaintiff of an "erroneous denial." *Am. Hosp. Supply Corp. v. Hosp. Prods., Ltd.*, 780 F.2d 589, 593 (7th Cir. 1986) (Posner, J.).



The requested injunction would constitute real hardship for AT&T.

5G Evolution is delivering industry-leading performance to customers on AT&T's network thanks to          dollars of investments in 5G-compatible upgrades and equipment, and an injunction would not be just.



Lastly, the injunction would unfairly restrict AT&T's right to define and speak about its progress to developing its own unique fifth-generation network. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (explaining that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). The injunction would force AT&T to compete with one hand tied behind its back, imposing a limitation on its use of the term "5G" that does not bind its primary competitors.

## IV. An Injunction Would Disserve the Public Interest by Chilling Innovation

The requested injunction would unduly elevate 3GPP's non-binding technical specifications and chill competition to implement alternative "5G" technologies. Constant competition to deliver the best network performance has led to incredible advances in wireless technology over the last twenty years. Just as in the transition from 3G to 4G, when LTE displaced Sprint's preferred WiMAX technology due to superior performance, the free market will determine the best 5G technologies. This Court would not serve the public interest by preemptively declaring which technologies constitute "true 5G" rather than allowing market forces to play out. *See Procter & Gamble Pharma., Inc. v. Hoffman-La Roche Inc.*, 2006 WL 2588002, *1 (S.D.N.Y. Sept. 6, 2006) (denying preliminary injunction in midst of "marketing battle" between "behemoths").

## V.   Sprint's Own Conduct Would Bar Equitable Relief

Sprint's requested injunctive relief is barred in this District because it has "engaged in the same kind of behavior that it challenges" on two related fronts. *See Stokely-Van Camp*, 646 F. Supp. 2d at 533–34 (claims regarding sports drink's ability to replace sweat barred due to plaintiff's similar claims); *Ultreo*, 574 F. Supp. 2d at 354–56 (claims regarding the need for live testing barred because plaintiff did not conduct live testing); *Haagen–Dazs v. Frusen Gladje*, 493 F. Supp. 73, 76 (S.D.N.Y.1980) (claims regarding defendant's false association with Scandinavia barred because plaintiff falsely associated as such). First, Sprint marketed its "Next Gen Network,"

███████████████████████████████████

Sprint's marketing efforts include several press releases, videos, and tweets, as well as presentations at industry conventions, that herald the benefits of using Sprint's Next Gen Network. DX-104; DX-123. In fact, the Next Gen Network ███████████████████████

Second, and more egregiously, Sprint began advertising in February that it offers "America's Mobile 5G Network," despite the fact that its 5G network will not launch anywhere for months and that Sprint cannot deploy nationwide 5G. DX-112; DX-113. Using Sprint's expert's survey methodology, AT&T's survey expert found that over 85% of respondents falsely believed based on Sprint's ads that Sprint is currently offering a 5G network. Simonson Dec at 62–67. Sprint cannot castigate AT&T's "5G Evolution" marketing—which AT&T actually *offers* to consumers—while at the same time Sprint itself is marketing "5G" outright despite not yet having deployed a standards-based 5G network.

## CONCLUSION

For these reasons, Sprint's request for preliminary injunction should be denied.

Dated: April 12, 2019                    REESE MARKETOS LLP

_____
Peter D. Marketos
Katie Dolan-Galaviz
Tyler J. Bexley
Sean F. Gallagher
Brett S. Rosenthal
750 N. Saint Paul Street, Ste. 600
Dallas, Texas 75201
Telephone: (214) 382-9810
Facsimile:  (214) 501-0731
pete.marketos@rm-firm.com
katie.galaviz@rm-firm.com
tyler.bexley@rm-firm.com
sean.gallagher@rm-firm.com
brett.rosenthal@rm-firm.com

Glen G. McGorty
Holly A. Melton
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, New York  10022
Telephone: (212) 223-4000
Facsimile:  (212) 223-4134
gmcgorty@crowell.com
hmelton@crowell.com

Christopher A. Cole
CROWELL & MORING LLP
1001 Pennsylvania Avenue
Washington, DC  20004
Telephone: (202) 624-2500
Facsimile:  (202) 628-5116
ccole@crowell.com

31

Steven M. Zager
Caitlin E. Olwell
Michael N. Petegorsky
Kristen D. White
Andrew Schreiber
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
Bank of America Tower
New York, NY 10036
(212) 872-1000 (phone)
(212) 872-1002 (fax)
szager@akingump.com
rhotz@akingump.com
bcarney@akingump.com
colwell@akingump.com
mpetegorsky@akingump.com
kristen.white@akingump.com
aschreiber@akingump.com

*Attorneys for Defendant AT&T Mobility LLC*